## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Rural Development Innovations Limited** *et al.*, | |
| Plaintiffs, | |
| **v.** | **Civil Case No. 25-cv-1631** |
| **Pete Marocco** *et al.*, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction ...............................................................................................1

Legal and Factual Background ...................................................................1

   I.   The United States African Development Foundation .........................1

   II.   February 19 Executive Order...........................................................4

   III.  Defendants takeover USADF..........................................................5

   IV.  Defendants effectively shut down USADF by gutting the staff and cancelling grants. ...........................................................................8

Argument.....................................................................................................12

   I.   Plaintiffs are likely to succeed on the merits. ..................................13

       A.   Marocco has no legal authority to serve in any USADF role. ......13

       B.   Defendants lacked authority to dismantle USADF.......................19

   II.   The remaining equitable factors weigh in favor of a preliminary injunction. ...................................................................................23

       A.   Plaintiffs are suffering irreparable harm...................................23

       B.   The balance of equities and public interest favor Plaintiffs. .......25

   III.  Congress provided the remedy for an FVRA violation—order the Defendants' actions void........................................................27

Conclusion ................................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
   121 F.4th 1314 (D.C. Cir. 2024)................................................................24

\* *Asylumworks v. Mayorkas*,
   590 F. Supp. 3d 11 (D.D.C. 2022) ....................................................19, 27

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
   280 F. Supp. 3d 59 (D.D.C. 2017),
   *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019)......................................................25

\* *Aviel v. Gor*, No. CV 25-778 (LLA),
   2025 WL 1009035 (D.D.C. Apr. 4, 2025), *appeal docketed*,
   No. 25-5105 (D.C. Cir. Apr. 7, 2025) ....................................16, 17, 19, 24

*Beattie v. Barnhart*,
   663 F. Supp. 2d 5 (D.D.C. 2009) ..............................................................23

*Brehm v. Marocco*,
   No. 25-cv-660 (D.D.C. Mar. 31, 2025)..........................................9, 15, 16

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ..........................................................26

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ..................................................................23

*City & Cnty. of San Francisco v. Trump*,
   897 F. 3d 1225 (9th Cir. 2018) ..................................................................22

*Edmond v. United States*,
   520 U.S. 651 (1997) ..................................................................................13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ..................................................................................20

*Freytag v. Comm'r of Internal Revenue*,
   501 U.S. 868 (1991) ..................................................................................13

\* Authorities principally relied upon are marked with an asterisk

*George v. Ishimaru*,
    849 F. Supp. 68 (D.D.C. 1994), *order vacated and appeal dismissed
    as moot*, No. 94-5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994) ........................18

*Immigr. and Naturalization Serv. v. Chadha*,
    462 U.S. 919 (1983) .................................................................18

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ......................................................22

*Jones v. Hendrix*,
    599 U.S. 465 (2023) .................................................................17

*Kingdomware Tech., Inc. v. United States*,
    579 U.S. 162 (2016) .................................................................21

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) ..................................................................21

*Myers v. United States*,
    272 U.S. 52 (1926) ..................................................................20

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) .................................................................14

* *NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017) ..........................................................13, 14, 27

*Noel Canning v. NLRB*,
    705 F.3d 490 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014) ...............17, 18

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) .................................................................17

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020) .................................................................19

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ........................................................25

iii

\* Authorities principally relied upon are marked with an asterisk

*Trump v. United States,*
    603 U.S. 593 (2024) ...................................................................................19

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
    599 U.S. 419 (2023) ...................................................................................17

*United States Inst. of Peace v. Jackson,*
    No. 25-CV-804 (BAH), 2025 WL 1428641 (D.D.C. May 19, 2025) .........................19

*United States v. Am. Tobacco Co.,*
    221 U.S. 106 (1911) ...................................................................................17

*United States v. Maurice,*
    26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) ......................................13

*United States v. Oakland Cannabis Buyers' Co-op.,*
    532 U.S. 483 (2001) ...............................................................................27, 28

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ...................................................................................20

**Constitutional Provisions**

U.S. Const. art. I, § 1 ...................................................................................19

U.S. Const. art. I, § 9 ...................................................................................22

*U.S. Const. art. II ...................................................................................13

**Statutes**

5 U.S.C. § 905 ...................................................................................20

* Federal Vacancies Reform Act

  5 U.S.C. § 3345 ...................................................................................14

  5 U.S.C. § 3346 ...................................................................................14

  5 U.S.C. § 3347 ...............................................................................14, 18

  5 U.S.C. § 3348 .......................................................................15, 16, 17, 27

iv

* Authorities principally relied upon are marked with an asterisk

5 U.S.C. § 3349c .................................................................................... 15, 16, 17

* 22 U.S.C. § 290h-1, *et seq.* ............................................... 1, 2, 3, 15, 21, 26

African Development Foundation Act, Pub. L. No. 96-533, Title V, 94
    Stat. 3131 (1980) ................................................................................ 20

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47,
    138 Stat. 460 (2024) .................................................................. 3, 4, 22, 23

## Regulatory Materials and Executive Orders

22 C.F.R. §§ 1500.1-1510.999 .................................................................. 11

Exec. Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025) ........................ 4, 5, 22

United States African Development Foundation: Notice of Meeting,
    90 Fed. Reg. 11037 (Mar. 3, 2025) .......................................................... 7

## Other Authorities

Cong. Rsch. Serv., R42852, Presidential Reorganization Authority:
    History, Recent Initiatives, and Options for Congress (2012),
    https://perma.cc/QY3T-XWG2 ................................................................ 20

S. Rep. No. 105-250 (1998) ..................................................................... 14

Temporary Presidential Designation of Acting Board Members of the
    Inter-American Foundation and the United States African
    Development Foundation, 49 Op. O.L.C. ___ (Mar. 14, 2025) ................... 16

United States African Development Foundation,
    https://perma.cc/N5BB-4RP6 (archived Mar. 21, 2025) ............................ 4

* Authorities principally relied upon are marked with an asterisk

## INTRODUCTION

The U.S. African Development Foundation was created by Congress, structured by Congress, and is funded by Congress. Despite the clear statutory requirement that USADF "shall have perpetual succession unless dissolved by an Act of Congress," 22 U.S.C. § 290h-4(a)(1), Defendants are dead-set on shuttering the agency.

With no legal authority, and in direct contravention of statutory and constitutional restrictions, Defendants insisted that President Trump did not need advice and consent of the Senate and that he could instead directly appoint Pete Marocco to be the Chair of USADF's Board. Marocco has since purported to install himself as President and CEO. In that supposed role, Marocco terminated or put on administrative leave every employee, save two. And he effectively cancelled every one of USADF's grants. As a result of Marocco's slash-and-burn approach, the agency cannot carry out its legally mandated functions. Plaintiffs—a USADF grantee and USADF employees—are paying the price. Without this Court's immediate intervention, Defendants' actions will not be able to be undone.

This is not a case about whether government should be more efficient. Nor is it a case about disagreements over the finer points of what Congress requires of USADF. The question here is whether Defendants can simply ignore a host of constitutional and statutory requirements to shut down an agency. They cannot.

## LEGAL AND FACTUAL BACKGROUND

### I.   The United States African Development Foundation

Congress established the United States African Development Foundation "to enable the people of African countries to develop their potential, fulfill their

aspirations, and enjoy better, more productive lives"; "to strengthen the bonds of friendship and understanding between the people of Africa and the United States"; "to support self-help activities at the local level designed to enlarge opportunities for community development"; "to stimulate and assist effective and expanding participation of Africans in their development process"; and "to encourage the establishment and growth of development institutions which are indigenous to particular countries in Africa and which can respond to the requirements of the poor in those countries." 22 U.S.C. § 290h-2(a).

Congress instructed USADF to carry out these purposes "in cooperation with, and in response to, organizations indigenous to Africa which are representative of the needs and aspirations of the poor in Africa," and directed that USADF shall "to the extent possible, coordinate its development assistance activities with the activities of the United States Government and private, regional, and international organizations." 22 U.S.C. § 290h-2(b). Congress specified that USADF "shall have perpetual succession unless dissolved by an Act of Congress." 22 U.S.C. § 290h-4(a)(1).

To fulfill its statutory mandates, Congress authorized USADF to "make grants, loans, and loan guarantees"—not to exceed $250,000 for any particular project—"to any African private or public group (including public international organizations), association, or other entity engaged in peaceful activities" including "the fostering of local development institutions," "the development of self-evaluation techniques by participants in projects supported" by USADF, "development research by Africans

and the transfer of development resources," and "the procurement of such technical or other assistance as is deemed appropriate by the recipient of such grant, loan, or guarantee." 22 U.S.C. § 290h-3(a). Congress directed that "the Foundation shall give priority to projects which community groups undertake to foster their own development and in the initiation, design, implementation, and evaluation of which there is the maximum feasible participation of the poor." 22 U.S.C. § 290h-3(b).

The management of USADF is vested in a board of directors, composed of seven members appointed by the President, with advice and consent of the Senate. 22 U.S.C. § 290h-5(a). All members of the Board shall be appointed "on the basis of their understanding of and sensitivity to community level development processes." *Id*. And members of the Board shall be appointed so that no more than four Board members belong to any one political party. *Id*. The Board manages USADF through the appointment and oversight of a President. 22 U.S.C. § 290h-5(d), (e).

Congress has appropriated to USADF, "[f]or necessary expenses to carry out the African Development Foundation Act," $45 million to remain available until September 30, 2025. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). Congress prohibited USADF from using any appropriated funds to "implement a reorganization, redesign, or other plan," that would "expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations" or "expand, eliminate, consolidate, or downsize the United States official presence overseas," without first consulting with the Appropriations

3

Committees of both houses and providing a detailed justification for any such plan. *Id.*, § 7063(a), (b), 138 Stat. at 843-44.

USADF works with partners in 22 African countries, focusing on "populations least served by existing markets or assistance programs" with the goal of helping them "transition out of poverty." United States African Development Foundation, https://perma.cc/N5BB-4RP6 (archived Mar. 21, 2025).[1] In fiscal year 2024, USADF investments included $16.56 million across 114 grants enhancing agriculture, $7.37 million across 34 grants expanding off-grid energy access, and $4.19 million across 94 grants advancing youth and women entrepreneurship. *Id.*; Ex. E, Declaration of Elisabeth Feleke ¶ 4.

## II. February 19 Executive Order

On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy." Exec. Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025). The purpose of the executive order is to "reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary." *Id.* § 1.

The executive order lists federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum

---

[1] Plaintiffs rely on an archived version of the USADF website because Defendants have shut down www.usadf.gov (among other things).

presence and function required by law." *Id.* § 2(a). The executive order lists USADF as one of the targeted entities. *Id.*

Under the executive order, "the head of each unnecessary governmental entity" had 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id.* § 2(b).

In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order." *Id.* § 2(c).

The executive order "shall [not] be construed to impair or otherwise affect," among other things, "the authority granted by law to an executive department, agency, or the head thereof" and "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3. The executive order does not give the U.S. DOGE Service any role to play in its implementation.

**III. Defendants takeover USADF.**

The day after the executive order was issued, Chris Young, a representative of the U.S. DOGE Service, met with members of the USADF leadership team. Ex. E, Feleke Decl. ¶ 5. At the meeting, Young explained that the U.S. DOGE Service intended to detail two engineers from the General Services Administration to USADF

5

who would provide software expertise to modernize architecture, update system design, and improve government efficiency. *Id.*

The next day, three DOGE employees—Ethan Shaotran, Nate Cavanaugh, and Jake Altik—arrived at USADF and met with USADF's leadership team. *Id.* ¶ 6. The DOGE team proceeded to describe their true intentions at USADF, which was not to streamline or improve operations. *Id.* ¶ 7. Instead, they intended to reduce the functions of USADF to the "minimum presence and function" required under the African Development Foundation Act, which in their view required that USADF retain only its Board and a single employee—the President—and that the agency maintain only one or two grants funded by private-sector partnerships. *Id.* In their view, all other personnel of the agency must be eliminated to fulfill the executive order. *Id.* The DOGE team demanded immediate access to USADF systems including financial records as well as human resources systems, which include staff job descriptions, personnel files, salaries, and organizational structure. *Id.* ¶ 8.

The USADF management team responded by requesting an assessment of the legal basis for DOGE's superficial interpretation of USADF's statutory function (which DOGE never provided). *Id.* ¶ 9. USADF management outlined the administrative process, including security clearances, that would be required to access sensitive data and personally identifiable information from the Agency's systems. *Id.* And management further explained that any attempt to provide access outside of the clearance process would be in violation of the Privacy Act. Overall,

USADF's Board of Directors and leadership refused to authorize or partake in what they understood as illegal activity by DOGE. *Id.*

On February 28, USADF management received a letter from the Presidential Personnel Office purporting to appoint Pete Marocco as the Acting Chair of the Board of USADF. *Id.* ¶ 10. The letter described USADF as "Board-less," even though four members of the Board remained. *Id.* No provision of law authorizes the appointment of a person to the Board of USADF on an acting basis, or on any basis other than Presidential nomination and Senate confirmation.

On March 4, the Board held its regularly scheduled, pre-announced, and publicly accessible quarterly meeting. *See United States African Development Foundation: Notice of Meeting*, 90 Fed. Reg. 11037, 11037 (Mar. 3, 2025). Despite having claimed to be the only Board member, Marocco did not attend this meeting. Ex. E, Feleke Decl. ¶ 11. Yet the next day, Marocco and several DOGE representatives arrived at USADF's offices around mid-day and were denied access. *Id.* ¶ 12. Marocco and his colleagues threatened to sue the building's private security guard and threatened to return with United States Marshals and Secret Service. *Id.*

The following day, they did just that. Marocco and his associates, accompanied by an individual purporting to be a U.S. Marshal, gained access to USADF's offices, and shut all USADF staff out by revoking key card access and locking the doors. *Id.* ¶ 14. While at the USADF office, Marocco purported to hold a meeting of the Board, consisting only of himself; the minutes of that meeting recite that "Pete vote [sic] to close the meeting to the public," voted to terminate Ward Brehm from his position as

President of USADF, and voted to appoint himself in Brehm's place as acting President and CEO of the Foundation. Ex. F. That same day, Cavanaugh emailed the Interior Business Center of the Department of the Interior on behalf of Marocco, requesting access to USADF staff human-resources files, which include salary, tenure, and personally identifiable information. Ex. E, Feleke Decl. ¶ 17.

**IV. Defendants effectively shut down USADF by gutting the staff and cancelling grants.**

**A. The staff:** Plaintiffs Solomon Chi and Paul Olson dedicated their careers to USADF's mission before they were terminated by Marocco. They are not alone; all but two of USADF's staff have been terminated, RIF'ed, or put on administrative leave, making it impossible for the few remaining staff members to carry out the agency's functions.

**1.** On March 18, Marocco, again under his purported authority as Acting Chair and President of USADF, placed almost all USADF staff on administrative leave, specifying that they are not permitted on USADF premises, that they are prohibited from accessing USADF systems, and that they may not act without Marocco's permission. Ex. E, Feleke Decl. ¶ 22. Only two members of USADF's staff have not been placed on administrative leave. *Id.*

On March 31, Marocco emailed Plaintiffs Solomon Chi and Paul Olson (along with one other employee) to inform them that they were being terminated from their employment with USADF under a reduction in force with an effective date of April 30. Ex. E, Feleke Decl., ¶ 23; Ex. C, Declaration of Paul Olson ¶ 6; Ex. D, Declaration of Solomon Chi ¶ 6. The emails attached a memorandum, also from Marocco, stating

8

that "[t]his RIF is necessary for workforce reshaping of the United States African Development Foundation." *See* Ex. C, Olson Decl. ¶ 6.[2] One week later, Marocco sent the same RIF notices to fourteen more USADF employees. Ex. E, Feleke Decl. ¶ 24. And two USADF employees accepted offers to participate in the Deferred Resignation Program. *Id.* ¶ 25. As a result, USADF has been reduced to ten staff members, but, again, only two remain because Marocco put the other eight on administrative leave. *Id.* ¶¶ 26, 27.

The cuts did not stop at USADF's full-time staff. USADF also employs contractors to carry out the agency's work. *Id.* ¶ 28. There are seven contractors in the Washington D.C. area, and fifteen country-program coordinators—that is, foreign nationals who perform local oversight activities in Africa on behalf of the agency. *Id.* Marocco has cancelled all of these contracts, effective immediately. *Id.* Additionally, USADF retains the services of local representatives in nineteen countries through partner grants. Recipients of partner grants perform services for USADF including project design, program development, oversight, training, monitoring, and evaluation. Marocco has terminated almost all of USADF's partner grants, effective immediately.[3] As a result, USADF does not have *any* staff remaining in Africa—staff that are necessary to carry out oversight of USADF grants. *Id.* ¶¶ 29, 30.

---

[2] Three hours *after* sending the RIF notices, Marocco submitted a declaration—signed under the penalty of perjury—stating that he had "taken no actions with respect to terminations of USADF staff." *Brehm v. Marocco*, No. 25-cv-660 (D.D.C. Mar. 31, 2025), ECF No. 31-3, ¶ 11.

[3] Three partner grants apparently still exist, but in name only. That is because the grantees rely on country-program coordinators—who have all been terminated—to be able to perform their services. Ex. E, Feleke Decl. ¶ 29.

**2.** The two remaining staff members cannot carry out the remaining functions of USADF.

To continue to administer grants to partners in Africa that fulfill Congress's requirements in 22 U.S.C. §§ 290h-2 and 290h-3, USADF must be able to perform portfolio management and oversight, including soliciting and reviewing quarterly reports from grantees, as well as reviewing disbursement requests, site-visit reports, project audits, work plans and performance assessments, implementation-related amendments, and close outs. Ex. E, Feleke Decl. ¶¶ 31, 32. USADF staff must meet quarterly with government partners in six countries and private-sector partners in four countries. *Id.* ¶ 33.

To comply with Congress's directives to award new grants, USADF staff must solicit grant proposals, screen thousands of applicants, and conduct preliminary site visits to hundreds of potential grantees in over twenty countries. *Id.* ¶ 34. Then, staff must review business registrations and corporate documentation, including articles of incorporation, financial statements, and identity checks of shareholders and boards. *Id.* ¶ 35. Finally, USADF staff must work with successful grant applicants to develop and complete grant projects by conducting market analyses, technology assessments, budget and financial analyses, and environmental screening. *Id.* ¶ 36.

Finally, to carry out USADF's duties under U.S. law, USADF staff must coordinate with U.S. embassies in more than twenty countries, manage USADF assets located abroad (including vehicles, equipment, and offices), and oversee foreign bank accounts. *Id.* ¶ 37. USADF staff must also ensure that the agency is complying

with extensive federal regulations, *see* 22 C.F.R. §§ 1500.1-1510.999, and laws, *see, e.g.*, 44 U.S.C. §§ 3551 *et seq.* (Federal Information Security Modernization Act). And USADF staff must respond to financial audits conducted by the Office of the Inspector General and Government Accountability Office. Ex. E, Feleke Decl. ¶ 38.

**B. The grantees:** Plaintiff RDI is a Zambian consulting firm that offers technical support to small businesses, including farmers' cooperatives, women- and youth-led enterprises, and community-based organizations. Ex. A, Declaration of Victor Makasa ¶ 2. RDI receives 100% of its funding from USADF. *Id.* ¶ 5. RDI has operated since 2017, under five-year cooperative agreements with USADF, which include year-long grants that are renewable annually. *Id.* Under those grants, RDI seeks disbursement of funds from USADF every two to three months. *Id.* ¶ 9. RDI's current cooperative agreement is from 2023-2028. *Id.* ¶ 5.

Yet on April 7, Marocco informed RDI that he authorized termination of RDI's agreement, effective immediately, because it was "no longer consistent with the agency's priorities." *Id.* ¶ 6. The termination did not explain the agency's newfound priorities. *See* Ex. B.

As a result of the termination, RDI is on the verge of collapse and, unless its grant is reinstated, will likely have to shutter entirely by the end of June 2025. Ex. A, Makasa Decl. ¶¶ 7, 10. What's more, under Zambian law, RDI must notify its employees of termination at least one month in advance and provide them a redundancy package equivalent to two months' salary for every year that they were employed. *Id.* ¶ 7. RDI (understandably) did not plan for the sudden termination of

11

its grant, so although it owes approximately $100,000 in redundancy packages, it has only approximately $24,000 in its accounts. *Id.*

Facing this existential threat, RDI has attempted to contact USADF to seek advice. *Id.* ¶ 8. But all RDI's contacts at USADF have been terminated (or put on administrative leave), so RDI is unable to reach anyone to provide guidance. *Id.*

RDI is far from the only grantee in this position. Marocco asserts that he has cancelled 353 of USADF's grants. Ex. E, Feleke Decl. ¶ 40. He has also asserted that 148 grants remain technically active. *Id.* But whether the remaining 148 grants have formally been terminated makes no difference. USADF no longer has the capability to pay the grantees their remaining funds, to coordinate with foreign partners who have pledged matching funds, or to conduct basic oversight to ensure grantees are carrying out the terms of their grants. *Id.* The upshot is that every grant has effectively been terminated, whether or not they formally remain open on the agency's books. *Id.*

## ARGUMENT

Defendants have effectively shut down USADF. Within three months, they terminated almost all staff, leaving just two, for whom it is impossible to carry out even a shred of what myriad statutes and regulations require of the agency. And they effectively cancelled every grant, leaving grantees to wither mid-grant.

Defendants have no legal authority to carry out any of those actions. Defendants decreed that Pete Marocco is the sole Board member of USADF. Marocco then ordained himself President and CEO. But the Federal Vacancies Reform Act, which implements Congress's constitutional powers of appointment, plainly prohibits

Marocco's appointment to USADF. So Plaintiffs are likely to succeed on the merits of their claims. Without this Court's immediate intervention, Plaintiffs will be irreparably harmed—within just over a month, RDI will cease to exist, and by the time the employees succeed on the merits of their claims, USADF will be reduced to rubble. Finally, because Defendants' actions unquestionably violate the FVRA, the balance of the equities and public interest favor preliminary relief. This Court should preliminarily enjoin Defendants from doing further damage while it considers the full merits of Plaintiffs' claims.

**I.  Plaintiffs are likely to succeed on the merits.**

**A.  Marocco has no legal authority to serve in any USADF role.**

The Appointments Clause of the United States Constitution requires that the President obtain "the Advice and Consent of the Senate" to appoint principal officers of the United States. U.S. Const. art. II, § 2, cl. 2. The Framers believed that an unchecked power to appoint executive officers was "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991). The Clause accordingly limits the appointment power by "dividing" it "between the Executive and Legislative Branches." *Freytag,* 501 U.S. at 884. "The Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293-94 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997); *see also United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J., sitting as circuit judge) ("[T]he president shall nominate, and by and with the consent of the

13

senate, appoint to all offices of the United States, with such exceptions only as are made in the constitution.").

Congress recognized, however, that the process of nomination and Senate confirmation "can take time," and that in some instances neither the President nor the Senate "may desire to see the duties of the vacant office go unperformed in the interim." *SW Gen., Inc.*, 580 U.S. at 293-94. Accordingly, "Congress has given the President *limited authority* to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval." *Id.* at 294 (emphasis added). Even this grant of limited authority is a departure from the constitutional norm, *NLRB v. Noel Canning*, 573 U.S. 513, 523 (2014), and thus must be narrowly construed.

The Federal Vacancies Reform Act describes the circumstances under which Congress has delegated to the President this limited authority to appoint acting officials. *See* 5 U.S.C. §§ 3345-3346; *SW Gen.*, 580 U.S. at 294-96. The FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless (1) another "statutory provision expressly" authorizes the President or another official to appoint an acting official, (2) a "statutory provision expressly" designates an acting official, or (3) the President validly makes a recess appointment. 5 U.S.C. § 3347(a); *see also* S. Rep. No. 105-250, at 11 (1998) (Congress enacted the FVRA "to ensure the exclusivity of the applicability of the Vacancies Act").

14

The FVRA's limited grant of authority does not allow the President to fill vacancies arising in boards "composed of multiple members" and boards that control a "Government corporation." 5 U.S.C. § 3349c(1). USADF is governed by a nonpartisan seven-member board, and it operates as a government corporation. 22 U.S.C. §§ 290h-4(b), 290h-5(a)(1). Accordingly, the FVRA does not allow the President to appoint acting members of the USADF Board. And no provision in USADF's organic statute (or any other source of law) grants the President the power to appoint acting board members. Instead, the statute specifies that Board members may be appointed only through the process of nomination and confirmation by the Senate. *Id.* § 290h-5(a)(1).

Because neither the FVRA nor any other provision of law contemplates the possibility of acting Board members, any vacancy on the USADF Board "shall remain vacant," 5 U.S.C. § 3348(b)(1), until the position is filled through the process of Senate confirmation. So any action taken by a person who purports to be an acting member of USADF's Board "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force or effect." *Id.* § 3348(d)(1). And any such action "may not be ratified." *Id.* § 3348(d)(2).

The purported appointment of Marocco as chairman of the Board of USADF is therefore void and must be treated as having no force. Defendants have resisted that conclusion through a tortured reading of the FVRA. *See Brehm v. Marocco*, No. 25-cv-660, Defs.' Cross-Mot. for S.J. at 13 (D.D.C. Mar. 31, 2025), ECF No. 31. They acknowledge, as they must, that the FVRA provides the exclusive means to appoint

an acting official and that the FVRA excludes the appointment of a member of a multi-member board (like USADF) on an acting basis. *Id.* From there, they contend that because the FVRA excludes boards like USADF's, *see* 5 U.S.C. § 3349c, it excludes those boards from the entirety of the law—including the statute's plain statement that it is the "exclusive means" of appointment of acting officials. *Id.* at 14. Therefore, according to Defendants, the President has implicit Article II authority to appoint acting members to the Board. *Id.*; *see also Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 2025 WL 945804 (O.L.C. Mar. 14, 2025) (Office of Legal Counsel opinion, released during the pendency of related litigation, recapitulating this line of reasoning).

But "reaching this conclusion requires a serious distortion—or a complete disregard—of the FVRA's text." *Aviel v. Gor*, No. CV 25-778 (LLA), 2025 WL 1009035, at *8 (D.D.C. Apr. 4, 2025) (preliminarily enjoining Marocco's appointment as President of USADF's sister agency, the Inter-American Foundation), *appeal docketed*, No. 25-5105 (D.C. Cir. Apr. 7, 2025). In the FVRA's plain language, Congress contemplated and rejected Defendants' argument—the statute specifies that "an action taken by any person who is not acting . . . in the performance of any function or duty of a vacant office to which this section and sections . . . 3349c apply shall have no force or effect," and "may not be ratified." 5 U.S.C. § 3348(d)(1), (2). Section 3349c, as noted above, is the provision that confirms that Congress withheld authority from the President to appoint acting members to multi-member boards. Put

16

another way, under Section 3348, when Section 3349c excludes multi-member boards from appointments of acting officers, the rest of the FVRA still applies. *See Aviel*, 2025 WL 1009035, at *8.

This Court should not read the FVRA, like Defendants do, to be "at war with itself." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 434 (2023) (quoting *United States v. Am. Tobacco Co.,* 221 U.S. 106, 180 (1911)). Sections 3348 and 3349c are easily read (and thus must be read) to be in harmony with each other. *See Jones v. Hendrix*, 599 U.S. 465, 478 (2023). Section 3349c provides that the preceding provisions of the FVRA shall not apply to Presidentially nominated and Senate-confirmed members of multi-member boards, 5 U.S.C. § 3349c(1). Section 3348, in contrast, specifies the rules for persons who are (invalidly) appointed to those boards without Senate confirmation: their seats shall remain vacant, and their actions shall be deemed to be without force and effect. 5 U.S.C. § 3348(b), (d). In all events, even if there were any conflict between Section 3348 and Section 3349c, the specific language of the first provision invalidating any actions of invalidly appointed board members would control over the general language of the latter provision. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012).

Just because "Congress has chosen not to provide for acting [Board] members[,] that choice cannot support" Defendants' sweeping (and novel) theory of Article II authority. *Noel Canning v. NLRB*, 705 F.3d 490, 511 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014); *see also Aviel*, 2025 WL 1009035, at *9. Congress has already "addressed the problem of vacancies on various multimember agencies," including USADF, by

17

"providing that members may continue to serve for some period past the expiration of their commissions until successors are nominated and confirmed." *Noel Canning*, 705 F.3d at 511. This Court should not "accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and equally remediable by—the executive and legislative branches." *Id.* This remains so even "if some administrative inefficiency results from" abiding by the Appointments Clause, because those concerns "do not empower [the Court] to change what the Constitution commands." *Id.* After all, "convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Id.* (quoting *Immigr. and Naturalization Serv. v. Chadha*, 462 U.S. 919, 944 (1983)).

For this reason, "[n]o court"—either before or after Congress's 1998 enactment of the FVRA as the exclusive vehicle for the appointment of acting officers—"has ever recognized that the President has such inherent authority" to appoint officers without Congressional authorization. *George v. Ishimaru*, 849 F. Supp. 68, 72 (D.D.C. 1994), *order vacated and appeal dismissed as moot*, No. 94-5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994). This Court should not be the first.

In short, there is no basis in law for Defendants to disregard the boundaries of Congress's limited grant of appointment authority in the FVRA. Congress specified that the FVRA provides the "exclusive means" for the appointment of acting officials in the absence of Senate confirmation, 5 U.S.C. § 3347(a), and it specifically withheld the authority to appoint acting members of multi-member boards, *see Noel Canning*, 705 F.3d at 511. In the absence of a grant of authority from Congress, the President

18

lacked the authority to appoint Marocco as an acting member of the Board of USADF.

It follows that Marocco lacked the authority to appoint himself as the President of

USADF, and that any actions he has purported to take in either capacity—including

the cancellation of the agency's grants and the termination of the agency's

employees—must be treated as void and as without effect. *See Asylumworks v.*

*Mayorkas*, 590 F. Supp. 3d 11, 26 (D.D.C. 2022); *Aviel*, 2025 WL 1009035, at *1; *see*

*also United States Inst. of Peace v. Jackson*, No. 25-CV-804 (BAH), 2025 WL 1428641,

at *40 (D.D.C. May 19, 2025) (invalidating all actions taken by improperly appointed

officials as "fruit of a poisonous tree"). Plaintiffs are therefore entitled to relief

precluding Marocco from exercising authority on behalf of USADF.

### B. Defendants lacked authority to dismantle USADF.

A preliminary injunction on the basis of Defendants' violation of the FVRA would

provide Plaintiffs with complete relief because it would invalidate each of the actions

Marocco has taken under his invalid claim to authority, including the elimination of

USADF's staff and the termination of the agency's contracts and grants. But this case

presents a second, and equally strong, ground for an injunction. Defendants have

violated the separation of powers, the Spending Clause, and have acted ultra vires by

violating USADF's organic statute and appropriations statute.

The separation-of-powers doctrine is "foundational" and "evident from the

Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591

U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637-638 (2024).

Congress has the exclusive power to make laws. *See* U.S. Const. art. I, § 1. As part of

that authority, the power to establish, reorganize, restructure, and abolish agencies

likewise rests squarely with Congress. *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]"); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010) ("Congress has plenary control over the salary, duties, and even existence of executive offices."). So Defendants lack the authority to unilaterally shutter USADF, an agency established by statute. African Development Foundation Act, Pub. L. No. 96-533, Title V, 94 Stat. 3131 (1980) (codified as amended at 22 U.S.C. § 290h *et seq*.).

Congress has, from time to time, given the President specific, circumscribed authority to reorganize the federal bureaucracy. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012), https://perma.cc/QY3T-XWG2 ("CRS Report") (summarizing history of Reorganization Acts). But it has consistently declined presidential requests for open-ended reorganization authority. *See id.* at 15-16, 20-23, 32 (describing failed efforts by the Truman, Lyndon B. Johnson, and George W. Bush administrations to obtain permanent reorganization authority). The last Reorganization Act expired in 1984, *see* 5 U.S.C. § 905(b), and Congress has rejected requests for further reorganization authority ever since. CRS Report at 31-33. Because Congress has legislated in this area and refused the power that the current Administration is asserting, the President's power is at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). A President and his

designees cannot unilaterally eliminate a congressionally created agency, through executive order or otherwise.

Nor may an administration decide that an agency's "priorities" include ignoring congressionally required activities. Congress specified that USADF "shall carry out" the purposes described in the African Foundation Act—including supporting development activities in Africa, assisting the participation of Africans in the development process, and encouraging the growth of African development institutions—"in cooperation with, and in response to, organizations indigenous to Africa which are representative of the needs and aspirations of the poor in Africa." 22 U.S.C. § 290h-2(b). Congress further specified that USADF "shall, to the extent possible, coordinate its development assistance activities with the activities of the United States Government and private, regional, and international organizations." *Id.* Congress directed USADF to "carry out the[se] purposes" by making grants, loans, and loan guarantees to African private or public groups engaged in peaceful activities, *id.* § 290h-3(a), and directed that the agency "shall give priority to projects which community groups undertake to foster their own development," *id.* § 290h-3(b).

These duties are not discretionary. "[T]he word 'shall' usually connotes a requirement," *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171 (2016), and "normally creates an obligation impervious to judicial discretion," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). Marocco, however, has terminated almost all of the agency's staff and almost all of the agency's grants, and has rendered it impossible for the few remaining employees to administer what

remains of the agency. Ex. E, Feleke Decl. ¶¶ 29-40; *see supra* 10-11 (outlining what is required of employees to carry out USADF's statutory and regulatory duties). By rendering USADF unable to fulfill its statutory duties, Marocco and the other Defendants unconstitutionally flouted Congress's commands.

Moreover, Congress has repeatedly appropriated funds to USADF to carry out its mandatory duties. Most recently, Congress appropriated to USADF, "[f]or necessary expenses to carry out the African Development Foundation Act," $45 million to remain available until September 30, 2025. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). Because the Constitution "exclusively grants the power of the purse to Congress, not the President," *City & Cnty. of San Francisco v. Trump*, 897 F. 3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7), "settled, bedrock principles of constitutional law" require the executive branch to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Even the Executive Order recognizes that Defendants cannot take USADF below the "minimum presence and function required by law." Executive Order, § 2(a). Congress specified the "minimum presence and function" by appropriating nearly $45 million to USADF, and Defendants' efforts to leave most of that money unspent through staff and grant terminations violate both the Spending Clause and the Impoundment Control Act. *See In re Aiken Cnty.*, 725 F.3d at 261 n.1. Although "a President sometimes has policy reasons (as distinct from constitutional reasons) for wanting to spend less than the full amount appropriated by Congress for a particular

project or program . . . even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Id.* (cleaned up). Yet Defendants have rendered it impossible for USADF to comply with Congress's instruction that it devote $45 million to African development by the end of this fiscal year. Ex. E, Feleke Decl. ¶ 34.

What's more, Congress prohibited USADF from using any appropriated funds to "implement a reorganization, redesign, or other plan," that would "expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations" or "expand, eliminate, consolidate, or downsize the United States official presence overseas," without first consulting with the Appropriations Committees of both houses and providing a detailed justification for any such plan. *Id.*, § 7063(a), (b), 138 Stat. at 843-44. Defendants have outright ignored these requirements too.

## II. The remaining equitable factors weigh in favor of a preliminary injunction.

### A. Plaintiffs are suffering irreparable harm.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). When analyzing irreparable harm, the Court assumes that a plaintiff has shown a likelihood of success on the merits. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

Each Plaintiff suffers irreparable harm in the absence of a preliminary injunction. RDI is entirely dependent on its funding from USADF. Ex. A, Makasa

23

Decl. ¶ 5. Worse yet, as a result of Marocco's sudden termination of its USADF grant, RDI is legally obligated to pay its staff their remaining salary and redundancy payments, and those obligations far exceed RDI's remaining reserves. *Id.* ¶¶ 7, 10. Absent relief from this Court, RDI will likely be forced to terminate all of its operations by June 30. *Id.* ¶ 10. Because RDI "faces a grave risk of being forced out of business" by Defendant's actions, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024), it suffers irreparable harm in the absence of an injunction.

Olson and Chi also suffer irreparable harm. Although "loss of employment is normally not enough to show irreparable harm," that is because backpay generally can make a former employee whole. *See Aviel*, 2025 WL 1009035, at *10. But as explained below (at 27-28), the required remedy for an FVRA violation is not backpay, it is an order that Defendants' actions were void ab initio (meaning that Olson and Chi were never terminated). Because Defendants' actions have effectively shuttered USADF, relief after final judgment would mean that employees would have the empty victory of returning to a "defunct organization." *Id.*; *see also* Ex. C, Olson Decl. ¶ 10-11 (explaining the irreparable harms to grantees, beneficiaries, and USADF's relationships and reputation that would result from waiting until relief after final judgment). And in the absence of prompt relief, Olson and Chi will continue to suffer the reputational harm from their termination. Ex. C, Olson Decl. ¶ 12; Ex. D, Chi Decl. ¶ 12. *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 104

24

(D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

## B. The balance of equities and public interest favor Plaintiffs.

Where the Government is the opposing party, the last two factors for injunctive relief merge, because "the government's interest is the public interest." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (internal quotation marks omitted). "A party's likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action." *Id.* (internal quotation marks and alterations omitted). Defendants' actions demonstrate a disregard for the structure that Congress has put in place for USADF, and the public interest weighs heavily in favor of enforcing the Congressional design. Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires immediate relief.

Moreover, the actions of Marocco and other Defendants to dismantle USADF "are impacting more than 2.4 million farmers in over 20 countries in Africa." Ex. E, Feleke Decl. ¶ 41. "These communities are losing their livelihoods with lost markets and contracts for their products," as they are losing the ability to buy necessary supplies for the crop growing season. *Id.* Even more alarmingly, "the delays in agriculture production are causing children in communities across the Sahel and East Africa to face severe malnutrition that cannot be reversed quickly without the resumption of USADF operations." *Id.* Children in Africa are losing the opportunity to attend school, given their families' sudden losses of income as a result of Marocco's actions. *Id.* "If operations do not resume quickly, USADF will likely not be able to reverse the

massive damage inflicted by Marocco and the DOGE team operating under his direction." *Id.* The public interest and the balance of the equities thus weighs heavily in favor of prompt relief here.

And there is nothing on Defendants' side of the scale: "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). That substantial public interest is particularly acute here. If Defendants could disregard the prohibition on the appointment of acting board officials that Congress put into place, the Appointments Clause and the FVRA, along with the statutory mandates in the African Development Foundation Act, would be rendered to be practical nullities.

Congress created USADF "to enable the people of African countries to develop their potential, fulfill their aspirations, and enjoy better, more productive lives." 22 U.S.C. § 290h-2(a). It is not in the public interest for Defendants to ignore the Congressional purposes that USADF fulfills simply because they wish to erase an agency from existence. And Defendants will in no way be harmed if a 44-year-old agency, with a 45-million-dollar appropriation over two years, continues to exist and function while the Court decides the merits of this case.

26

### III. Congress provided the remedy for an FVRA violation—order the Defendants' actions void.

Upon finding that a violation of the Federal Vacancies Reform Act has occurred, this Court's inquiry is at an end, and this Court must award relief unwinding Defendants' actions. When Congress enacted the FVRA, it explicitly removed discretion from the federal courts and mandated that relief be awarded in cases involving actions based on a putative acting officer's invalid claim of authority. The FVRA provides that "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which [section 3349c applies] shall have no force or effect," and "may not be ratified." 5 U.S.C. § 3348(d). Thus, absent an exception specified in the statute itself, "actions taken in violation of the FVRA are void *ab initio*." *SW Gen.*, 580 U.S. at 298 n.2.

In other words, "[t]he plain terms of the FVRA remove remedial discretion by directing that unlawful actions under that statute are void ab initio, thereby rendering the rules without 'force or effect' and requiring vacatur." *Asylumworks*, 590 F. Supp. 3d at 26. This Court should therefore order that all the actions taken by Defendants under Marocco's invalid claim of authority, including the termination of grants and firing of employees, were invalid from the start, and must be unwound. "[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). "Once Congress, exercising its delegated powers, has decided the

order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought." *Id*.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs preliminary injunctive relief until the Court can further consider the merits.

May 21, 2025                                Respectfully submitted,

                                             */s/Bradley Girard*
Bradley Girard (DC Bar No. 1033743)
Joel McElvain (DC Bar No. 448431)
Robin F. Thurston (DC Bar No. 1531399)
Skye Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
bgirard@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiff*