# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Rural Development Innovations Limited** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **Pete Marocco** *et al.*, <br><br> Defendants. | **Civil Case No. 25-cv-1631** |

# DECLARATION OF PAUL OLSON

I, Paul Olson, declare under penalty of perjury under the laws of the United States of America, including 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of Chantilly, Virginia.

2. I worked for the United States African Development Foundation from 1991 until 2025.

3. During my tenure at USADF, I held a variety of positions. I started as a Regional Manager, became a Regional Director, and was the Chief Program Advisor up until the time of my involuntary termination.

4. As the Chief Program Advisor, I provided advice as requested by the Chief Program Officer (CPO) and President/Chief Executive Officer on program strategy, budgeting, implementation, and reporting. My duties also included providing temporary coverage for programs when assigned staff are on leave or during peak workload periods, as well as review and clearance of final project

1

approval documents for new grants for CPO approval. I provided orientation and training for new program staff, mentored and advised new staff members. I also served as a Contract Officer Representative (COR) for our Country Program Coordinators to review and clear recruitment, invoicing, and contract-closeout actions.

5. On March 18, 2025, I received a memorandum from Pete Marocco, purporting to act as USADF CEO and President. Marocco's memorandum placed me on administrative leave, effective immediately. Marocco informed me that he prohibited me "from entering ADF premises, accessing ADF systems, or attempting to use [my] position or authority with ADF in any way." Marocco also directed that I remain available by telephone and email during working hours. Because I did not have access to USADF systems, I was told to email Marocco my personal contact information, including phone number, email, and home address.

6. On March 31, 2025, I received another memorandum from Pete Marocco, titled "Specific Notice of Reduction in Force." Marocco told me that I was being "separated from the Federal service effective 4/30/2025." The only reason Marocco gave for the RIF was that "[t]his RIF is necessary for workforce reshaping of the United States African Development Foundation."

7. Because of the RIF, as of April 30, 2025, I am no longer employed by USADF.

8. The RIF was involuntary. I did not desire to end my employment at USADF. Given the opportunity, I will return to my employment at USADF.

9. I am aware that Marocco has effectively cancelled all USADF grants and terminated or put on administrative leave all but two USADF employees.

10. If I am allowed to return to my employment as USADF only after a full trial in this case, I do not think I will be able to perform my job functions in the same manner as before my termination. A lengthy delay after the suspension of activities, cancellation of grants, and the termination of staff contracts will require a greater effort to reinitiate or to properly close out the grants or programs. In the interim, small businesses that depended on USADF grants may have closed and may no longer be able to viably reopen. Other USADF grantees may have suffered irreparable harm due to legal action taken against them in local courts for inability to honor contracts for services or assets ordered prior to the grant suspensions. Others may have uncompleted or empty infrastructure or unused equipment that has deteriorated due to lack of completion or use, becoming "white elephants" as a result of the abrupt and unplanned termination process. And all grant beneficiaries will no longer have trust or confidence in duly approved commitments by the United States Government and its representatives to honor its commitments or abide by its policies, particularly for long term activities or actions. Trust and good reputations built over decades with host country officials and institutions will require time and effort to rebuild, likely slowing progress on even routine requirements.

11. In addition, staff of our technical partners who provided technical assistance to applicants and grant beneficiaries will have moved to find employment elsewhere. As a result, resumption of activities, either for grant closeout or new grant

funding will require a high level of effort to identify, train and advise new staff to carry out the activities required, resulting in lower initial efficiency and increased unit costs. And contractors will likely be more hesitant to work with the Foundation, which will again affect ability to attract top talent at competitive prices.

      12. The loss of my employment has resulted in a loss of income due to the reduction in income in retirement, as well as potential additional accrual of leave. In addition, my retirement income is lower that it would have been if based on the average income at my higher salary due to expected step increases if I had continued in service. The termination of my employment has also resulted in reputational damage; even though I was not personally responsible for the suffering and damage the suspension/termination of grants and contracts has caused for thousands of grant beneficiaries and service providers, I was the face of the agency to many of those people, and their attitudes, opinions and trust in me as the representative with whom they dealt have been irreparably damaged.

Chantilly, Virginia                                          _/s/ Paul Olson_
May 21, 2025                                                Paul Olson