# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Rural Development Innovations Limited** *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>**Pete Marocco** *et al.*,<br><br>Defendants. | Civil Case No. 25-cv-1631 |

**DECLARATION OF ELISABETH FELEKE**

I, Elisabeth Feleke, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Chief Program Officer at the United States African Development Foundation (USADF).

2. I have been with USADF since October 2020. I oversee the program division within USADF, with activities in more than 20 countries in Africa.

3. USADF was established by Congress to invest directly in African grassroots enterprises and social entrepreneurs. USADF provides grant funds, among other resources, to develop, grow and scale African enterprises and entrepreneurs who improve lives and livelihoods. USADF's investments increase incomes, revenues, and jobs by promoting self-reliance and market-based solutions to poverty. USADF works with partners in 22 African countries, focusing on populations

1

least served by existing markets or assistance programs with the goal of helping them transition out of poverty.

4. In fiscal year 2024, USADF made significant investments to drive growth in key sectors, including $16.56 million across 114 grants enhancing agriculture, $7.37 million across 34 grants expanding off-grid energy access, and $4.19 million across 94 grants advancing youth and women entrepreneurship.

5. On February 20, 2025, Chris Young, a senior member of the Department of Government Efficiency (DOGE) team, met with the USADF leadership team, including me, at headquarters. Young explained that he was there to introduce DOGE to the Agency. He also announced that two software engineers would be assigned to the Agency to modernize the Agency's IT systems and create efficiencies in our operations. During discussions, I stated to Mr. Young that modernizing our IT systems and databases was welcome news and that we fully supported the mission of using technology to create a more efficient workforce. Mr. Young spoke about his experience in Africa as a child of missionaries and stated that he has seen first-hand the many problems that USADF is trying to address. He mentioned that due to the urgency of responding to the President's Executive Order aimed at USADF, the two engineers would come to the Agency the next day on February 21.

6. On February 21, Ethan Shaotran, Jacob Altik, and Nate Cavanaugh arrived at USADF. Shaotran and Cavanaugh introduced themselves as IT personnel from GSA. Altik stated that he was a lawyer from the White House Personnel Office.

They explained that we needed to immediately sign a memorandum of understanding for their detail assignment.

7. Once the MOU was signed, Altik explained the true purpose of the meeting, which was to provide USADF leadership with DOGE's interpretation of the "minimum presence and function" required by USADF's statute. DOGE read the statute to mean: 1) only the USADF Board and President/CEO are statutorily required, 2) only one or two grants funded by private sector partnerships are required, and 3) all other personnel/employees therefore needed to be eliminated under the Executive Order.

8. Cavanaugh and Altik then demanded immediate access to USADF systems including financial records as well as payment and human resources systems, which include staff job descriptions, personnel files, salaries, and organizational structure.

9. USADF's management and Board asked the legal basis for DOGE's interpretation of USADF's statutory function. We further outlined the administrative process, including security clearances, that would be required to access sensitive data and personally identifiable information from USADF systems. We explained to DOGE that any attempt to provide access outside of the clearance process would be in violation of the Privacy Act. Overall, we refused to partake in any request that violated our legal duties.

10. On February 28, 2025, Trent Morse of the Presidential Personnel Office sent USADF management an email asserting that, because USADF was "Board-less," Pete Marocco had been appointed as Acting Chair of the Board of USADF.

11. I attended the March 4, 2025, public meeting of the USADF Board. Pete Marocco did not attend.

12. On March 5, 2025, Marocco and multiple DOGE employees attempted to enter USADF's offices but were denied access. In response, they threatened the building's security guard, informing him that they would return with Secret Service agents and Federal Marshals. They also threatened to sue the security guard.

13. On March 6, 2025, USADF staff who were outside of the Foundation's offices saw Pete Marocco and several of his associates walk into the building that includes our offices. I confirmed with the building's security officer that they were accompanied by a person representing himself to be a U.S. Marshal, who had provided a badge and confirmed that their intentions were to access USADF offices without the approval of USADF management.

14. The U.S. Marshal told the building's property manager that he needed access to USADF's offices. The property manager, at the direction of a federal law-enforcement officer, gave Marocco and the others access to the elevator to the tenth floor. The property manager then unlocked the USADF offices for Marocco and the others to enter. After gaining access to the offices, Marocco and his associates shut all USADF staff out by revoking key card access, disabling door access, and locking the front door.

15. That same day, Pete Marocco, in his purported capacity as Acting Chair, held what he characterized as a meeting of the Board of USADF. No other member of the Board of USADF was in attendance. Pete Marocco made a motion to appoint himself as the President of USADF. Pete Marocco cast a vote in favor his mown motion. As Pete Marocco was the only purported member of the Board in attendance, he declared that his motion had been adopted and he declared himself to be the President of USADF.

16. Since that date, Pete Marocco and other agents of Defendants have repeatedly referred to Marocco as the Acting Chair or the President of USADF and have attempted to exercise the agency's authorities by virtue of the claim that Marocco holds those positions.

17. On March 13, the Interior Business Center (IBC) of the Department of the Interior informed USADF management that on March 6, a member of DOGE staff, Nate Cavanaugh, sent a request to access USADF staff human resources files, which include salary information, tenure, and personally identifiable information. The request via email was copied to Marocco and Ethan Shaotran.

18. IBC further stated that on March 6, Cavanaugh had informed IBC staff that the request comes directly from Marocco and referred to Marocco as the current Chair of the USADF board.

19. IBC requested documentation of the appointment of Marocco as Acting Chairman and President of USADF. On March 12, IBC received the completed form signed by Marocco as "Chairman," requesting access to all HR systems for USADF.

5

20. On March 13, IBC provided access to USADF human resources data to Marocco, while specifying the privacy concerns attached to these files.

21. On March 17, five USADF junior and mid-level staff members received the same email from a staff member of the U.S. DOGE Service, Justin Fox, requesting access to USADF human resources data. Fox stated that he was reaching out on behalf of Marocco in his capacity as Acting President of USADF. He further stated that Marocco would like USADF staff to help with accessing USADF's grants system.

22. On March 18, Marocco, again under his purported authority as Acting Chair and President of USADF, placed almost all USADF staff on administrative leave, specifying that they are not permitted on USADF premises, that they are prohibited from accessing USADF systems, and that they may not act without Marocco's permission. Only two members of USADF's senior leadership have not been placed on administrative leave.

23. At 8:44 p.m., on March 31, 2025, three employees of USADF received emails from Pete Marocco, who identified himself as "Acting President and CEO, USADF," informing these employees that they were being terminated from their employment with the Foundation under a reduction in force (RIF), with an effective date of April 30, 2025. The emails attached a memorandum, also from Pete Marocco in his purported capacity as Acting President and CEO, stating that "[t]his RIF is necessary for workforce reshaping of the United States African Development Foundation."

24. On April 7, 2025, fourteen employees of USADF received emails from Pete Marocco, who identified himself as "Acting President and CEO, USADF," informing these employees that they were being terminated from their employment with the Foundation under a reduction in force (RIF), with an effective date of May 7, 2025. The emails to these fourteen employees, like the emails of March 31, 2025, to three employees, attached a memorandum, also from Pete Marocco in his purported capacity as Acting President and CEO, stating that "[t]his RIF is necessary for workforce reshaping of the United States African Development Foundation."

25. Two additional employees of USADF accepted offers to participate in the Deferred Resignation Program.

26. With these resignations, as well as the termination of the employment of seventeen employees that Mr. Marocco announced on March 31 and April 7, USADF has been reduced to ten employees (not counting three employees of the U.S. DOGE Service who have been detailed to USADF on Marocco's orders).

27. Of the ten remaining employees, Marocco put all but two on administrative leave.

28. USADF also has employed contract personnel. Marocco has cancelled these contracts, effective immediately, resulting in the termination of seven contractors in the Washington, D.C., area, and the termination of fifteen country program coordinators, that is, foreign nationals who have served USADF on a contract basis to perform local oversight activities on behalf of the agency.

29. In addition to contracts with country program coordinators, USADF has also retained the services of local representatives in nineteen countries through partner grants. Recipients of partner grants have performed services for USADF including project design, program development, oversight, training, monitoring, and evaluation. Marocco has terminated almost all of USADF's partner grants, effective immediately. I understand that three partner grants in Kenya, Cote d'Ivoire, and Namibia have not been terminated. Whether the partner grants remain in place or not, these grantees would depend on interaction with country program coordinators to be able to perform services on behalf of USADF. Because all of the agency's country program coordinators have been terminated, the recipients of partner grants no longer have the means to perform services for the agency.

30. As a result, USADF no longer has any active personnel in Africa, either employed directly by the agency or performing services under a contract or grant, who are able to perform grant implementation services for USADF.

31. The remaining employees, all of whom are based domestically, cannot perform the statutory functions of USADF. To administer grants to partners in Africa that fulfill the purposes that Congress has directed USADF to fulfill in 22 U.S.C. §§ 290h-2 and 290h-3, USADF personnel must be able to perform portfolio management and oversight duties including the solicitation and review of quarterly reports from grantees, as well as the review of disbursement requests, site visit reports, project audits, work plans and performance assessments, implementation-related amendments, and close outs.

32. In addition, USADF personnel must be able to perform annual portfolio reviews to evaluate performance indicators of all active grants, including the grading of these grants based on project-specific performance indicators.

33. USADF personnel must also be able to conduct quarterly meetings with, and reports to, strategic government partners in six countries as well as private sector partners in four countries.

34. Over the past decade, USADF has received an average annual congressional appropriation of $34.6 million, totaling $346 million. These funds have been effectively leveraged with $37 million in additional funding from African governments and private-sector partnerships. In its most recent appropriation, Congress instructed USADF to spend $45 million, available through September 30, 2025, to further its statutory mission of supporting entrepreneurship in Africa. USADF has used the appropriation to fund 550 grants that are currently in effect. To date, USADF has obligated approximately $13.9 million out of that appropriation, and approximately $31.1 million of the appropriation remains to be obligated between now and the end of the fiscal year. To comply with Congressional instructions to devote $45 million to grants to African partners through September 30, 2025, USADF personnel must also be able to perform activities relating to the awarding of new grants, including the solicitation of grant proposals, the screening of thousands of applicants for eligibility and fit, and the performance of preliminary site visits to hundreds of potential grantees in over twenty countries.

9

35. As a matter of due diligence, USADF must also be able to review business registration requirements, review corporate documentation including documents of incorporation and financial statements, and perform identity checks of shareholders and boards of directors.

36. For successful grant applicants, USADF personnel must also be able to complete project design and development of the grants, including market analyses, technology assessments, budget and financial analyses, and environmental screening reports.

37. USADF personnel must also be able to perform notifications and coordination with United States embassies in more than twenty countries; manage USADF assets located abroad including vehicles, equipment, and offices; and maintain oversight of foreign bank accounts.

38. USADF staff must also be able to implement and respond to financial audits, including Federal Information Security Management Act audits, of the agency conducted by OIG and GAO.

39. The remaining employees of USADF personnel cannot perform any of these functions. They cannot perform any of the actions that are necessary to award new grants using the funds that Congress has appropriated for his purpose, and they cannot perform any of the actions that are necessary for effective implementation and oversight of the agency's existing grants. Indeed, the remaining employees do not even have the capability to establish contact with USADF's existing grantees.

40. I understand that Marocco has asserted that he has cancelled 353 of USADF's existing grants, and that 148 grants remain active. On May 14, 2025, however, after Marocco made that assertion, additional USADF grantees, including grantees in Benin and Zimbabwe, received notices signed by Marocco informing them that their grants had been terminated. Whether or not some or all of the 148 grants that Marocco referred to have been formally terminated, USADF no longer has the capability to pay amounts remaining to be disbursed on these grants, to coordinate with foreign partners to arrange the payment of amounts those partners have pledged in matching funds, or to maintain basic functions of oversight to ensure that grantees are performing their functions consistently with the terms and conditions of each grant. As a result, every grant of USADF has effectively been terminated, even if some grants continue to appear on the agency's records as active.

41. Marocco's cancellations of USADF grants are impacting more than 2.4 million farmers in over 20 countries in Africa. These communities are losing their livelihoods with lost markets and contracts for their products. They are unable to buy inputs such as fertilizers and seeds for production which means they are missing the narrow window of the crop growing season. More importantly, the delays in agriculture production are causing children in communities across the Sahel and East Africa to face severe malnutrition that cannot be reversed quickly without the resumption of USADF operations. I received reports that children as young as ten years old have stopped going to school to help families cope with the sudden change in income and their inability to pay school fees. Farmers are also facing mounting

11

legal and financial liabilities from unfinished construction projects and imported farming equipment held at various ports which began with USADF funding. If operations do not resume quickly, USADF will likely not be able to reverse the massive damage inflicted by Marocco and the DOGE team operating under his direction.

42. If Pete Marocco's purported appointments as Acting Chair of the Board of Directors of USADF and as President of USADF were determined to be invalid, the management of USADF would also treat his cancellation of USADF grants and contracts and his reduction-in-force of USADF employees as invalid, and would continue to administer the agency's existing contracts and grants and would continue to employ agency employees who have been purported to be subject to a reduction-in-force.

43. Attached as Exhibit F is a copy of a document purporting, incorrectly, to be the minutes of a March 6, 2025 meeting of the Board of USADF conducted by Pete Marocco.

Washington, DC                                             /s/ Elisabeth Feleke
May 21, 2025                                               Elisabeth Feleke