UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RURAL DEVELOPMENT INNOVATIONS
LIMITED, *et al.,*

          Plaintiffs,

    v.

PETER MAROCCO, *et al.,*

          Defendants.

Civil Action No. 25-1631 (RJL)

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Defendants, various government components and officials, including the President, sued in their official capacities, respectfully submit this memorandum in opposition to Plaintiff's motion for a preliminary injunction ("Pl Mot.") (ECF No. 7).

## INTRODUCTION

On February 24, 2025, President Trump removed the members of the U.S. Africa Development Foundation Board of Directors. Four days later, President Trump designated Peter Marocco to act Chairman of the Foundation Board. Marocco took steps to implement President Trump's executive order directing that the Foundation be reduced to its core statutory functions which involved implementing a reduction in force of Foundation employees and canceling Foundation grants.

Plaintiff Rural Development Innovations ("RDI") is a Foundation grantee whose grant was canceled, and Plaintiffs Paul Olson and Solomon Chi are former Foundation employees who were removed from their positions as part of the reduction in force. Plaintiffs brought suit against various high level government officials including the President, challenging Marocco's temporary designation as chairman of the Foundation board and the subsequent changes that Marocco made at the Foundation. Plaintiffs also moved for a preliminary injunction seeking Marocco's removal as acting Chairman of the Foundation Board and voiding all actions that Marocco took as chair. As a basis for the relief sought, Plaintiffs cite the Federal Vacancies Act, the Administrative Procedures Act, and various provisions of the United States Constitution. Plaintiffs have not demonstrated that they are entitled to this extraordinary remedy of a preliminary injunction.

Plaintiffs are unlikely to succeed on the merits of their claims. First, because the Federal Vacancies Act does not apply to the Foundation, the President has the inherent authority under Article II of the Constitution to designate acting members of the Foundation Board until the Senate

confirms his nominees to fill full terms on the Board and thus Marocco's designation as the acting Board chairman was lawful. Second, this Court does not have jurisdiction to hear Plaintiffs' claims. The RDI grant that Marocco terminated was a cooperative agreement, or contract, between RDI and the Foundation and claims alleging a breach of contract against a federal agency must be brought before the Court of Federal Claims. Similarly, Olson and Chi lack a cause of action in this court challenging their terminations because claims challenging federal personnel actions must be brought before one of the administrative tribunals established under the Civil Service Reform Act. Third, Plaintiffs' Constitutional claims are, at bottom, questions of statutory interpretation that are not properly brought as Constitutional claims. Moreover, the Court should not entertain Plaintiffs' constitutional claims because doing so would be an infringement on the President's authority over foreign affairs. Finally, Plaintiffs' APA claims fail because they are not challenging a discrete final agency action and an agency's staffing decisions are committed to Agency discretion by law. Additionally, to the extent that Plaintiffs' APA claims challenge the termination of RDI's grant and the termination of Olson and Chi's employment, those claims fail because RDI has an alternative remedy under the Tucker Act and Olson and Chi have alternative remedies under the Civil Service Reform Act.

Plaintiffs have failed to demonstrate irreparable harm because the harms to them are entirely economic that can be compensated if the Court rules in their favor on the merits. RDI has not identified any specific reasons why it cannot restart operation if its grant is restored at a later date. Moreover, Olson and Chi's loss of employment does not constitute irreparable harm because they can be compensated through backpay. Plaintiffs also cannot establish irreparable harm based on alleged harm to third parties.

Finally, the balance of equities favors Defendants.  The President has selected Marocco to run the Foundation on his behalf.  A preliminary injunction preventing Marocco from acting as Chairman of the Foundation board and voiding the actions that Marocco took as Chairman would prevent the President from exercising all of the executive power.

## BACKGROUND

### I.    **Legal Background.**

In 1980, Congress established the United States African Development Foundation ("the Foundation"), 22 U.S.C. § 290h-1(a), to strengthen ties between the United States and African Nations and "enable the people of African countries to develop their potential, fulfill their aspirations, and enjoy better, more productive lives, the purposes."  *Id.* § 290h-2(a).  The Foundation is tasked with making "grants, loans, and loan guarantees to any African private or public group (including public international organizations), association, or other entity engaged in peaceful activities for" carrying out its purposes.  *Id*. § 290h-3(a)(1).

Congress also established a Board of Directors tasked with managing the Foundation. *Id.* § 290h-5(a). The Board is "composed of seven members appointed by the President, by and with the advice and consent of the Senate," for six-year terms.  *Id*. § 290h-5(a)(1). And the President may select a chairperson and vice chairperson among the board members.  *Id*. § 290h-5(a)(1)-(2). No more than four Board members can be members of the same political party.  *Id.* § 290h-5(a)(1). The Board, in turn, is empowered to appoint "a president of the Foundation on such terms as the Board may determine."  *Id*. § 290h-5(d)(1).  The statute lacks any statutory removal protections. *See generally, Id.* § 290h-5(a)-(e).

On February 19, 2025, President Trump signed an Executive Order to "commenc[e] a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary."  Exec. Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 25, 2025).  The Executive Order

directed that "the non-statutory components and functions of" four named governmental entities "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id*. The Foundation was among the four entities subject to the order. *Id*. § 2(a)(iii). The Executive Order directed the Foundation to "submit a report to the Director of the Office of Management and Budget confirming compliance with this [Executive O]rder and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id*. § 2(a)(iii).

## II.    <u>Factual Background.</u>

Plaintiffs are two former employees of the Foundation and a Zambia based firm that previously had a grant from the Foundation. Compl. ¶¶ 13-15. Specifically, Plaintiffs Paul Olson and Solomon Chi had their employment with the Foundation terminated effective April 30, 2025. *Id*. ¶¶ 14-15. Plaintiff Rural Development Innovations ("RDI") is a consulting firm based in Lusaka, Zambia that had partnered with the Foundation on economic development projects in Zambia. *Id*. ¶ 13. RDI receives 100 percent of its funding from the Foundation through a "cooperative agreement" between RDI and the Foundation. Makasa Decl. ¶ 5 (ECF No. 7-2).

On February 24, 2025, President Trump removed the sitting members of the Foundation Board. First Marocco Decl. ¶ 4 (*Brehm v. Marocco*, Civ. A. No. 25-660 (RJL) (ECF No. 31-3)). Four days later, with the Foundation lacking a Board and a president, President Trump designated Marocco as the acting Chairman of the Board, and the only Board member. *Id*. ¶ 5. On March 6, 2025, Marocco convened a Board meeting where he appointed himself president of the Foundation. *Id*. ¶ 6. As part of his efforts to comply with Executive Order 14,217, which directed that the Foundation be reduced to its statutory minim, on March 31, 2025, Marocco terminated

three employees.  Second Marocco Decl. ¶ 6 (*Brehm v. Marocco,* Civ. A. No. 25-660 (RJL) ECF
No. 35-1).  Olson and Chi were two of these three employees.  Olson Decl. ¶ 6 (ECF No. 7-4);
Declaration of Solomon Chi ("Chi Decl.") ¶ 6 (ECF No. 7-5).  Olson and Chi's terminations were
effective on April 30, 2025.  *Id.*

On April 7, 2025, Marocco terminated an additional sixteen employees and canceled 350
grants.  Second Marocco Decl. ¶¶ 11-12.  The Foundation's grant to RDI was among the grants
that was cancelled.  Makasa Decl. ¶ 5. Victor Makasa, a program manager for RDI attested that
unless RDI receives "a notification that its cooperative agreement has been restored by June 30,
2025, it very likely will be unable to continue operating." *Id.* ¶ 10.

On April 8, Marocco cancelled forty-three of the Foundation's contracts.  Second Marocco
Decl. ¶ 13.  As of April 9, 2025, the Foundation has thirteen employees, 148 grants, and eight
contracts.  *Id.* ¶¶ 14-16.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter
v. Nat. Res. Def. Council,* 555 U.S. 7, 24 (2008).  A party seeking preliminary relief must make a
"clear showing that four factors, taken together, warrant relief: likely success on the merits, likely
irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and
accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir.
2016) (*quoting Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).  The last
two factors merge when the government is the opposing party.  *Guedes v. Bureau of Alcohol,
Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019); *accord Pub. Citizen Health
Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 20 (D.D.C. 2018). "[P]laintiffs bear the burden of
persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary

remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC,* 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)). The Supreme Court subsequently reaffirmed its disagreement with the sliding scale approach holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney,* 602 U.S. 339, 346 (2024) (*quoting, Winter*, 555 U. S., at 20). And where, as here, a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

## ARGUMENT

Plaintiffs fail to satisfy any of the factors necessary for the extraordinary remedy they seek— and preliminary injunction compelling Defendants, including the President, to remove Marocco, a presidentially-designated official from a principal office, and invalidate all actions that Marocco took in his capacity as the acting Chairman and president of the Foundation. As explained below, Plaintiffs are unlikely to succeed on the merits of any of their claims, Plaintiffs have failed to demonstrate that they will suffer irreparable harm absent preliminary relief, and the public interest and the balance of equities favors maintaining the status quo.

## I.    <u>Plaintiffs Will Not Succeed on the Merits.</u>

"'Failure to show a likelihood of success on the merits' is enough to show that a preliminary injunction is not warranted.'"  *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018*); see also, Starbucks Corp*., 602 U.S. at 346.  Plaintiffs' claims will not succeed on the merits for four reasons.  First, President Trump lawfully designated Marocco to temporarily act as president of the Foundation and this Plaintiffs are not entitled to any order voiding Marocco's actions.  Second, insofar as RDI challenges Marocco's decision to terminate their cooperative agreement and Olson and Chi challenge Marocco's decision to terminate their employment, those claims must be heard by another court or administrative body.  Third, Plaintiffs have failed to state viable claims stemming from their constitutional objections to Defendants changes to the Foundation.  Fourth, Plaintiffs have failed to state viable claims under the Administrative Procedures Act.  Each of these four bases is discussed below.

### A.    President Trump Lawfully Designated Marocco to Act as Chair of the Foundation.

The Constitution vests the entirety of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id.* § 3.  As the Supreme Court has long held, that executive power encompasses the authority to remove those who aid the President in carrying out his duties.  *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020).  The President has the authority to remove the Foundation's Board members at will because they are principal officers without any statutory removal protections.  *Trump v. Wilcox*, No. 24A966, 2025 U.S. LEXIS 1984, at *1 (U.S. May 22, 2025) (the President "may remove without cause executive officers who exercise that power on his behalf"); *See also Harris v. Bessent*, No. 25-5037, slip op. 26–30,  (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring) (noting

that statutory removal protections cannot apply to principal officers who perform solely executive functions).

The President must be able to designate acting officials to fulfill his duty to "take care that the laws be faithfully executed." *See* Art. II, § 1, cl. 1; id. § 3. The President has "powers not enumerated in the statutes—powers derived not from statutory grants but from the Constitution." *See Request of the Senate for an Opinion as to the Powers of the President "in Emergency or State of War,"* 39 Op. Att'y Gen. 343, 347 (1939). "As part of his executive power," the President must be able to "select those who [are] to act for him under his direction in the execution of the laws." *Myers v. United States*, 272 U.S. 52, 117 (1926*); see e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 492 (2010). Relevant here, the President has the "concomitant power to name acting officials when necessary to fulfill his constitutional duties, at least where no statute precludes it." *Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. __, 4 (March 14, 2025) ("*Acting Board Members*"). The President's inherent powers under the Take Care Clause would extend to designating acting members of the Board" to manage the Foundation temporarily. *Id.* at 6.

Here, the President lawfully exercised his discretion in removing the Foundation Board members. There is no statute that limits or prohibits the President's prerogative to ensure the Foundation has temporary leadership, particularly in the context of a presidential transition. Therefore, nothing required the President to leave the Foundation leaderless and unable to "direct the exercise of all the powers of the Foundation" until the Senate considers his nominees for to fill vacancies on the Board. 22 U.S.C. § 290h-5(a); *see also, Acting Board Members*, 49 Op. O.L.C. __, at 6 ("no statute specifically governs the President's authority to designate acting Board

members.")  Instead, the President has the concomitant authority, incident to his Article II power, to designate acting officers. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Robert Jackson, J., concurring) ("congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility").  The President's authority to designate in the face of statutory silence is consistent with the Framers' demand for "unity in the Federal Executive" to guarantee "both vigor and accountability."  *Printz v. United States*, 521 U.S. 898, 922 (1997).

Because Congress has not provided for procedures that the President must undertake to fill vacancies on the Foundation board, "any actual test of power" depends on "imperatives of events and contemporary imponderables rather than on abstract theories of law."  *Youngstown Sheet & Tube Co.*, 343 U.S. at 637.  Here, President Trump needs individuals who could "exercise all powers of the Foundation," consistent with his agenda, until the Senate could confirm his nominees. 22 U.S.C. § 290h-5(a).  "If the President could not task a politically accountable official to fill the [Foundation's] leadership positions in an acting capacity, the President functionally could not exercise his Take Care authority."  *Acting Board Members*, 49 Op. O.L.C. __, at 9.

Plaintiffs argue that the Federal Vacancies Act limits the President's authority to designate acting Board members for the Foundation.  Pl. Mot. at 20.  But statutes like the Federal Vacancies Act are a limitation on the President's power, not the source of his authority.  *See, e.g.*, *Acting Board Members*, 49 Op. O.L.C. at 6–10; *Power of the President to Designate Acting Member of the Federal Home Loan Bank Board*, 1 Op. O.L.C. 150 (1977) ("Whatever the term 'independent' may mean …, the continued functioning of the Board is plainly included in the constitutional responsibility of the President as the head of the executive branch to take care that the laws be

faithfully executed."); *Authority of the President to Remove the Staff Director of the Civil Rights Commission and Appoint an Acting Staff Director*, 25 Op. O.L.C. 103 (2001) (similar).

      In that vein, the Federal Vacancies Act applies to "any office of an Executive agency" "for which appointment is required to be made by the President, by and with the advice and consent of the Senate" unless the Act specifies otherwise. 5 U.S.C. § 3347(a). The Federal Vacancies Act does indeed specify otherwise for entities like the Foundation because Congress excluded those entities from it. 5 U.S.C. § 3349c(1). Specifically, Federal Vacancies Act does not apply to "any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that is composed of multiple members; and governs an independent establishment or Government corporation." 5 U.S.C. § 3349c(1). Plaintiffs concede that the Foundation qualifies as an entity described in this provision. Pl. Mot at 21. But Plaintiffs construe this provision to mean the President does not have any authority to designate officials to act as Board members. *Id.* This interpretation is incorrect. If the Federal Vacancies Act itself does not apply to the Foundation, then Section 3345, which governs procedures for designating acting officers in the event that a Senate-confirmed position becomes vacant, and Section 3346, which limits the amount of time that a designee can serve in an acting role, would not apply to the Foundation either. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) (statutory provisions "must [be] place[d] . . . in context"—including in the context of each other—and "interpret[ed] . . . to create a symmetrical and coherent regulatory scheme."). Most importantly, the carve out in Section 3349c also means that Federal Vacancies Reform Act's provision—set out in section 3347—making the statute the "exclusive means" for the appointment of acting officials in some circumstances does not affect the President's authority to designate acting members of the Foundation Board.

In an attempt to neutralize Section 3349(c), Plaintiffs rely on Section 3348(d)(1), Pl. Mot at 22-23, which provides that "[a]n action taken by any person who is not acting . . . in the performance of any function or duty of a vacant office to which to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect."  5 U.S.C. § 3348(d)(1).  But, Section 3349c(1) is among the listed sections and, as such, Marocco can be temporarily designated to be an acting member of the Foundation Board because of Section 3349c(1).  By arguing that the carve-out in Section 3349c means that the President cannot designate individuals to temporarily act as Board members under any circumstances, Plaintiffs advance an interpretation that would make portions of Section 3348(d)(1) superfluous.  Specifically, it would not be possible for someone to act "in the performance of function or duty to which [Section 3349c] appl[ies]," 5 U.S.C. § 3348(d)(1), unless Section 3349c contemplated some form of temporary designation.  *See Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 583 U.S. 109, 121-22 (2018) ("the Court is obliged to give effect, if possible, to every word Congress used.") (cleaned up).  Rather than specify any limits on the President's temporary designation authority, Section 3349c simply lists the types of entities that are not subject to the Federal Vacancies Act.

Plaintiffs' reliance on *NLRB v. Noel Canning*, 573 U.S. 513 (2014) is also misplaced.  *Noel Canning,* 573 U.S. at 519, concerned the scope of the President's power to make recess appointments to the National Labor Relations Board.  Here, President Trump did not appoint Marocco to the Foundation board as a recess appointment; rather, the President simply designated Marocco to perform the duties of the Chairman of the Foundation Board while the Senate considers the President's nominees to the Foundation Board for full terms.  First Marocco Decl. ¶ 5.

To be sure, as Plaintiffs note, the D.C. Circuit's ruling in *Noel Canning v. NLRB,* 705 F.3d 490, 511 (D.C. Cir. 2013) cites 5 U.S.C. § 3349c(1) with the aside that "Congress has chosen not

to provide for acting NLRB members." But that line has no applicability because the case did not deal with the Federal Vacancies Act, and the Supreme Court did not rely on this analysis in upholding the D.C. Circuit's view. *See generally, Noel Canning*, 573 U.S. at 513. The dicta, therefore, cannot and does not control this case. "A bare assumption is not the type of 'carefully considered language of the Supreme Court' that [the D.C. Circuit] considers authoritative for purposes of applying Supreme Court dictum." *Seed v. EPA*, 100 F.4th 257, 266 (D.C. Cir. 2024) (*quoting Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 211-12 (D.C. Cir. 2013)). Plaintiffs' reliance on *George v. Ishimaru*, 849 F. Supp. 68, 70 (D.D.C. 1994) is similarly misplaced. *George* was subsequently vacated as moot. *George v. Ishimaru*, No. 94-5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994) (per curiam). In the normal course, appellate courts vacate judgments as moot "because doing so 'clears the path for future relitigation of the issues between the parties,' preserving 'the rights of all parties,' while prejudicing none 'by a decision which ... was only preliminary.'" *Alvarex v. Smith*, 558 U.S. 87, 93 (2009) (*quoting United States v. Munsingwear*, 340 U.S. 36, 40 (1950)). In short, because of the vacatur, *George* is no longer precedent.

Because Congress has not provided for procedures that the President must undertake to fill vacancies on the Foundation Board and the President must "take care that the laws be faithfully executed," the President must be able to "select those who [are] to act for him under his direction in the execution of the laws," *Myers*, 272 U.S. at 117, even those that simply act as "acting" members until the Senate confirms a permanent replacement.

**B. Plaintiffs' Claims Must Be Heard by Another Court or Administrative Body.**

Insofar as RDI challenges the termination of its cooperative agreement and Olson and Chi challenge the termination of their employment, the Court lacks subject matter jurisdiction over

those claims. Specifically, RDI's challenge to the termination of the cooperative agreement must be brought before the Court of Federal Claims and Olson and Chi's challenge to the termination of their employment must be brought through the administrative scheme of the Civil Service Reform Act.

    1.    Termination of the Cooperative Agreement with RDI.

This Court lacks jurisdiction over claims stemming from grant terminations by the federal government. "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (U.S. 2025) (quoting 28 U.S.C. § 1491(a)(1)); *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, Civ. A. No. 25-0465, 2025 WL 763738 at *4 (D.D.C. Mar. 11, 2025) (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government" (*quoting Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)).

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides for judicial review of breach claims for express or implied contracts over $10,000 in the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011). The D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4 (quoting *Transohio Sav. Bankl*, 967 F.2d at 609). Put another way, "[t]he only remedy to which the United States has consented in cases of breach of contract is to the payment of money damages in either the Court of [Federal] Claims, if the amount claimed is in excess of $10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is $10,000 or less. 28 U.S.C. § 1346(a)(1)." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989). And "[f]ederal courts do not

have the power to order specific performance by the United States of its alleged contractual obligations." *Id.* at 3.

*U.S. Conference of Catholic Bishops*, 2025 WL 763738 at *2-3, amplifies the Supreme Court's reasoning in *California*. In *U.S. Conference of Catholic Bishops*, a grantee that had been receiving funds via cooperative agreements with the State Department sought a temporary restraining order preventing the State Department from terminating cooperative agreements with that grantee. *Id.* at *2–3. The court noted that the grantee had millions of dollars in requested reimbursements pending and that without ongoing funding the grantee claimed "thousands of refugees already in its care would soon lack enough support." *Id.* at *2. Nonetheless, the court declined to grant preliminary relief, holding the Tucker Act stripped it of jurisdiction to entertain such a claim. *See id.* at *4–8. The court explained that "the ultimate inquiry of whether a claim is 'essentially a contract action' turns on two key considerations: '[t]he source of rights upon which the plaintiff bases its claims and the type of relief sought." *Id.* at *5 (*quoting Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)). The court found the latter factor to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract." *Id.* (quoting *Albrecht*, 357 F.3d at 68). There, as here, RDI (as the grantee) sought an order enjoining the government from taking steps to give effect to a letter terminating its. However, as the court in *U.S. Conference of Catholic Bishops* explained, "[s]tripped of its equitable flair, the requested relief seeks one thing: [plaintiff] wants the Court to order the Government to stop withholding the money due under [its grant agreements]. In even plainer English: [the plaintiff] wants the Government to keep paying up. Thus [the plaintiff] seeks the classic contractual remedy of specific performance." *Id.* at *7 (quotation omitted). The court held that treating the remedies sought in that case as equitable "would be to distort the obvious" since

- 14 -

plaintiffs asked the court "to reverse the Government's decision to cease a financial relationship with the [plaintiff]." *Id.*

Here, RDI's claims are grounded in the alleged need for undisrupted finding pursuant to a cooperative agreement with the Foundation. *See e.g.*, Makasa Decl. ¶ 10. The heart of RDI's action then is to enforce the government's monetary obligations pursuant to that agreement. Congress has made clear that any funds distributed to grantees like RDI are paid via grant agreements, *i.e.* contracts between the agency and the grantees. See 42 U.S.C. § 12561(b) ("The Corporation . . . is authorized to make grants to, and enter into contracts . . . ."); *id.* § 12653(a) ("The Corporation may carry out [activities] . . . through grants, contracts, and cooperative agreements with other entities"). This is true regardless of whether RDI frames those as "programs" or "grants"—they are governed by and paid via contract. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) (cautioning against "creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)).

RDI attempts to sidestep the Tucker Act's jurisdictional mandate by casting their claim as a request for equitable relief stemming from statutory mandates. *See* Compl. ¶¶ 85, 93, 97. But RDI cannot recast its Tucker Act claim as a claim for equitable relief under the Administrative Procedures Act or the Federal Vacancies Act when the requested relief is the same: reopening the spigot of grant disbursements. To the extent that RDI has any entitlement to funds, that entitlement stems from the cooperative agreement itself, Compl. ¶ 7; Makasa Decl. ¶¶ 5-6, not the Constitution, the APA, or the Federal Vacancies Act. Those grants are contracts, and suits challenging their termination—and RDI's demand that the government keeps paying funds out from these terminated grants—belong in the Court of Federal Claims. *Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025), ECF No. 30 (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's Department of Education decision); *see also Sols. in*

*Hometown Connections v. Noem*, No. Civ. A. No. 25-0885, 2025 WL 1103253, at *11 (D. Md. Apr. 14, 2025) (denying motion for emergency relief challenging the termination of certain grants in light of the Supreme Court's order and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction").

Because RDI seeks to ensure the government's continued compliance with the terms of their grant agreement, RDI's claims sound in contract and are properly brought before the Court of Federal Claims.

2.    The Civil Service Reform Act Provides the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals.

Olson and Chi challenge Marocco's decision to terminate their employment specifically, and Plaintiffs also appear to challenge the propriety of the reduction in force generally.  Compl. ¶¶ 58-62.  Federal law does not permit Plaintiffs to employ an APA or Constitutional action to challenge the removal of federal employees.  Rather, in the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, Congress established a comprehensive framework for evaluating adverse employment actions against federal employees and presenting an integrated scheme of both administrative and judicial review of challenged personnel practices.   In so doing, Congress balanced "the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration."  *United States v. Fausto*, 484 U.S. 439, 445 (1988). With limited exceptions not relevant here, Congress sought to reduce the participation of the federal courts, preferring the use of the CSRA's grievance procedures over all other remedies. Specifically, the CSRA makes the Office of Special Counsel, the Merit Systems Protection Board, and the Federal Labor Relations Authority the exclusive means for federal employees, applicants, labor unions and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988), even when

- 16 -

those disputes involve constitutional claims, *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019).

The Supreme Court has long recognized that Congress established the CSRA as a comprehensive scheme covering all matters involving federal employment. *See Fausto*, 484 U.S. at 455. Indeed, the Supreme Court has held that, even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" *Elgin*, 567 U.S. at 12. The CSRA thus precludes "precludes courts from providing supplemental remedies." *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018); *Saul v. United States*, 928 F.2d 829, 835–42 (9th Cir. 1991) ("Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *Veit v. Heckler*, 746 F.2d 508, 510–11 (9th Cir. 1984).

Because federal law requires channeling of all claims related to federal employment via the administrative bodies that Congress created in the CSRA, this Court lacks jurisdiction to consider Plaintiffs' claims to the extent they challenge the removal of federal employees from their positions. Indeed, such a holding is consistent with *California,* 145 S. Ct. at 968, which held that the APA does not allow litigants to forestall properly applicable channeling regimes that Congress established.

### C. Plaintiffs Cannot Challenge Defendants' Decision to Restructure the Foundation As a Constitutional Violation.

Beyond the temporary designation of Marocco and the termination of RDI's grant and Olson and Chi's employment, Plaintiffs advance the alternative arguments that Defendants' changes to the Foundation violates the "separation of powers, the Spending Clause," and that

Defendants "have acted ultra vires by violating [the Foundation's] organic statute and appropriations statute." Pl. Mot at 25. These arguments lack merit. Plaintiffs seek to transform a dispute over statutory interpretation—what functions the Foundation must carry out to fulfill Congress's mandate—into an interbranch, constitutional dispute. But Plaintiffs' artful pleading is insufficient to overcome the Supreme Court's clear instruction that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472.

Simply put, a claim that the Executive is exercising authority in a manner that violates statute is merely a claim that an official has acted in excess of his statutory authority—it is not elevated to a "constitutional" claim merely because it identifies a conflict between a congressional statute and Executive action. *See Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' non-constitutional claim that respondent acted in excess of powers granted him by Congress." (emphases added)). In other words, the distinction is between when an official claims "statutory authority" for their action—a statutory claim—versus when the official claims to be acting "in the absence of any statutory authority," but pursuant to authority vested by the Constitution itself—a constitutional claim. *See id.* at 473 (emphasis omitted).

The Court's as-applied inquiry with respect to the grant terminations and reductions in force asks whether the relevant statute permits Marocco to take these actions. This question is a quintessential "excess of authority" determination. Thus, Plaintiffs' claims are not bestowed with constitutional dimensions simply because Plaintiffs attempt (and fail) to assert a facial separation-

of-powers claim. Plaintiffs' case must rise and fall on the claims Plaintiffs choose to bring. Here, Plaintiffs' as-applied "Spending Clause" claim with respect to any specific termination falls at the threshold under *Dalton*.

Indeed, Plaintiffs' reliance on Section 7063(a), (b)(1) of the Further Consolidated Appropriations Act, 2024, 138 Stat. at 746, demonstrates why Plaintiffs' claims present, at most, a dispute regarding statutory construction. Pl. Mot at 28-29. That provision directed that appropriated funds "may not be used to implement a reorganization, redesign, or other plan . . . without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." 138 Stat. at 843-44. But Executive Order No. 14,217 did not contravene that instruction. To the contrary, it directed that "the non-statutory components and functions of" four named governmental entities "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Executive Order No. 14,217 § 2(a).

The relief that Plaintiffs seek would threaten the separation of powers and undermine the President's authority over foreign affairs. Marocco determined that RDI's grant is "no longer consistent with the agency's priorities and no longer serves the interest of the United States and the [Foundation] Program." Letter to Makasa (ECF No. 7-3 at 3). The grant was revoked to as part of an effort to repurpose "funding allocations in a new direction in furtherance of the President's agenda." *Id*. Similarly, Marocco determined that the reduction in force, which included the termination of Olson and Chi's employment, was necessary for "workforce reshaping of the [Foundation]." Olson Decl. ¶ 6; Chi Decl. ¶ 6. Under Article II of the Constitution, the President and his subordinates have broad authority to attend to the foreign affairs of the nation,

including by determining how foreign aid funds are used. Accordingly, while the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (*quoting Youngstown Sheet & Tube Co.*, 343 U.S. at 610–11 (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (the President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown,* 343 U.S. at 635 & n.2 (the President can "act in external affairs without congressional authority").

Plaintiffs' contention that the Executive Branch is infringing on Congress's power of the purse is therefore incorrect even if funding for the grant agreements at issue here were congressionally mandated (and it is not). Pl. Mot. at 29. "[I]f a congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority . . . over foreign affairs . . . a situation would be presented very different from [a domestic impoundment]." Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Suppl. Op. O.L.C. 303, 310–11 (1969). Defendants' actions not only fit comfortably within the Executive Branch's unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable discretion not to take action. *Cf. Heckler v. Chaney*, 470 U.S. 821 (1985). It is precisely the sort

of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary. Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot . . . be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does. The President is the nation's organ in and for foreign affairs.'').

As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams*, 570 F.2d at 954–55. Plaintiffs are therefore not likely to prevail on their separation of powers claims because the relief they seek would overstep into the exclusive domain of the Executive.

**D. Plaintiffs Fail to State a Viable Claim under the Administrative Procedure Act.**

Finally, Plaintiffs challenge Defendants' cancelation of grants and reduction in force as "in excess of statutory jurisdiction, authority, or limitations," in violation of the APA.  5 U.S.C. § 706(2)(C).  But Plaintiffs cannot advance these claims through the APA because they are not challenging are not challenging a discrete agency action, and staffing decisions are committed to Agency discretion by law.  Moreover, Plaintiffs have alternative remedies to redress their own alleged injuries.

1.     <u>Plaintiffs' APA Claim Fails to the Extent they Are Not Challenging a Discrete Final Agency Action.</u>

Plaintiffs' claims fail because they are not challenging a discrete agency action, but rather a collection of grant terminations, personnel actions, and programmatic activities.  Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891.  That agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  Consistent with these principles, the APA does not permit Plaintiffs to "seek wholesale improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law.  *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).  "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id.*

In support of their APA claim, Plaintiffs state "Defendants' actions to terminate [the Foundation's] contracts and grants, terminate the employment of [the Foundation's] employees, and render it impossible for [the Foundation] to perform its statutory functions are in violation of

[the Foundation's] organic statute, 22 U.S.C. § 290h et seq., and of appropriations statutes under which Congress directed [the Foundation] to make expenditures in furtherance of the agency's statutory mission."  Compl. ¶ 97.  The APA does not permit such sweeping challenges.

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892–93 (footnote omitted).  Just as in *Lujan*, Plaintiffs' APA claims seek to bring a collective, programmatic, challenge to the possibility that the Foundation will fail to disburse grant funds as they become due and the prospect that the Foundation may be unable to comply with generalized purported statutory obligations given their current staffing decisions.  Compl. ¶ 97. But these are grab-bag challenges to general agency operations, not discrete challenges to concrete agency actions.

Wholesale challenges like Plaintiffs' are impossible to litigate under the mechanics of judicial review that the APA contemplates.  "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials considered "in making the challenged decision." *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).  Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242,

- 23 -

1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment. Nor is it possible for the Court to apply the applicable standard of review, *see* 5 U.S.C. § 706, to the agency action. Accordingly, Plaintiffs are unlikely to succeed on their APA claims because they are sweeping programmatic challenges and thus not cognizable under the APA.

Moreover, the Foundation's ongoing compliance with Executive Order 14,217 is not, itself, a final agency action reviewable under the APA. To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Under *Bennett*'s first prong, the Foundation's ongoing implementation of the Executive Order marks the initiation, not the consummation, of the agency's decision-making process. The Foundation's actions reflect decisions by agency leadership to realign their policy goals and actions consistent with the current administration's directives. Those decisions are "preliminary" in nature and "not directly reviewable[.]" *See* 5 U.S.C. § 704. "[They] may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the interim decisions themselves the "consummation of the administrative process" reevaluating the agency's priorities. *Id*. at 113; *see EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel.").

Nor does the Foundation's efforts to implement the Executive Order satisfy the second *Bennett* prong. Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must

consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). Plaintiffs' claims of injury would not stem from the programmatic efforts of the agency writ large, but from specific challenges to specific activities stemming from programmatic plans—from a grant termination (were such terminations reviewable under the APA, which they are not), or the specific cancellation of services to which the Plaintiffs had a legal entitlement.

As explained Part B above, to the extent that RDI is challenging the termination of its own grant, that claim must be brought under the Tucker Act, and to the extent that Olson and Chi are challenging their own terminations, those claims must be brought under CSRA. But Plaintiffs' purported challenge to all of Maroocco's funding and personnel decisions since he became acting Chair of the Foundation cannot be challenged under the APA because it is not a discrete final agency action.

### 2.    Staffing Decisions are Committed to Agency Discretion.

Plaintiffs complain that the Foundation's staff reduction and its effect on the Foundation's ability to carry out what Plaintiffs believe are the Foundation's legally mandated obligations. Pl. Mot at 16-17. But this conflates two distinct inquires: (1) internal agency staffing determinations, on one hand, and (2) specific provision of specific services to them, on the other. The first is committed to agency discretion, and Plaintiffs cannot use their fears about the future provision of the latter to justify challenges to the former.

Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vt. Yankee v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Indeed, internal staffing decisions are traditionally left to an agency's discretion. *See id.* at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). To override these principles and enjoin Foundation leadership from exercising procedural control over their own staff to ensure that Foundation staff are carrying out statutory obligations or otherwise exercising Foundation leadership's policies would be an extraordinary violation of the separation of powers. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191–92 (quoting 5 U.S.C. § 701). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best first the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler*, 470 U.S. at 821. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

Second, Plaintiffs can point to no statute limiting the agency's inherent discretion to make independent staffing decisions. Again, agencies generally have broad discretion to fashion internal

procedures for formulating policies and implementing a statute. *See Vt. Yankee*, 435 U.S. at 543. Ultimately, if Plaintiffs are dissatisfied with the provision of specific services in a manner that would constitute final agency action, they may challenge that action. And they cannot preemptively challenge staffing determinations antecedent to those actions on the fear that the agency may not later be able to comply with any statutory mandates. But it is the latter challenge Plaintiffs bring, because they cannot bring the former.

3.    Plaintiffs Have Adequate Alternative Remedies.

Finally, to the extent that RDI intends to challenge the termination of its own grant and Olson and Chi intend to challenge the termination of their own employment under the APA, those claims fail because Plaintiffs have alternative remedies. The APA does not apply where there is "[an]other adequate remedy in any court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). An "adequate remedy," in turn, is available where a statutory review provision allows for *de novo* of the agency action challenged, *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005), even where the relief available under the statutory provision is not identical to APA relief, *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009). Stated differently, where an agency action is subject to review in some manner under a statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme, because the mode of review established by the statutory review scheme is presumed exclusive. This is true even where a statutory review scheme provides only for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *See Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984) ("[W]hen

a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").

Under these principles, Plaintiffs are not entitled to review under the APA because other statutory review schemes are available to redress their claims. Specifically, as explained in part b, RDI can be compensated for its loss of grant funds under the Tucker Act. *See, e.g., Brazos Elec. Power Coop., Inc. v. United States*, 144 F.3d 784, 788 (Fed. Cir. 1998) (Holding Section 704 barred district court review because the Court of Federal Claims could provide relief over plaintiff's claim for monetary damages under the Tucker Act). And Olson and Chi can challenge their termination under the CSRA. It is well-settled that if Congress has provided an adequate procedure to obtain judicial review over an agency action, then that statutory provision is the exclusive path for review to obtain judicial review. *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 419-23 (1965); *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008) (noting that the APA does not independently grant subject matter jurisdiction and that its provisions cannot override other more specific "statutory limitations on judicial review of agency action"); *Love v. Connor*, 525 F. Supp. 2d 155, 158-59 (D.D.C. 2007) (female farmers had no APA claim against USDA for discrimination because Congress created a specific complaint procedure against the Department of Agriculture).

## II.    **Plaintiffs Failed to Demonstrate Irreparable Harm.**

The "high standard for irreparable injury"—even higher here insofar as Plaintiffs request a mandatory injunction that would alter the status quo, *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)—requires a two-fold showing: First, because an irreparable injury "must be both certain and great," Plaintiffs "must show 'the injury complained of is of such imminence that there

is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (*quoting Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Second, "the injury must be beyond remediation." *Id.* Importantly, irreparable harm "is a threshold requirement for granting temporary injunctive relief." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009). For that reason, even if Plaintiffs had a likelihood of success on the merits, which they do not, their motion should be denied because Plaintiffs failed to demonstrate irreparable harm.

Olson and Chi's purported irreparable harm is their loss of employment and harm to the Foundation. Pl. Mot at 29-30. But none of these harms are irreparable harms that would warrant issuing a preliminary injunction. First, loss of employment does not constitute irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974) (holding loss of income, face, and reputation do not amount to irreparable harm); *see also, Dellinger v. Bessent,* No. 25-5052, slip op. at 6-7 (D.C. Cir. March 10, 2025) (denying a stay pending appeal, giving effect to the removal of appellee from his position as Special Counsel for the U.S. Office of Special Counsel)*; See also Hetreed v. Allstate Ins. Co.,* 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65–66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury"). Should the Court determine, at the conclusion of this case that Olson and Chi's removal was unlawful, then Olson and Chi can obtain monetary relief in the form of back pay. In other words, if Olson and Chi's removal caused an injury to their legally protected interests, that injury can be remedied and thus any harm that Olson and Chi experiences is not irreparable in the interim. *English*, 279 F. Supp. 3d at 335 (any harm that an agency director suffered from removal "can be remediated in the ordinary course of this case."); *Davis*, 76 F. Supp. 3d at 65 ("The plaintiff fails to meet this

high standard as he has no concrete proof that the vacancy . . . will not be available when this matter is ultimately resolved.").

Second, Olson and Chi complain of harm to the Foundation, its grantees, and its beneficiaries. But this argument conflates Olson and Chi's fortunes with those of the Foundation. To demonstrate irreparable harm, Olson and Chi must explain how terminating their employment at the Foundation will cause irreparable harm not to the Foundation, but to them personally. *Brehm v. Marocco*, Civ. A. No. 25-660 (RJL), 2025 U.S. Dist. LEXIS 71326, at * 6-7 (D.D.C. Mar. 11, 2025 (denying the plaintiff a temporary restraining order to stop his removal as President of the U.S. Africa Development Foundation for lack of irreparable harm because the plaintiff "has not identified any cognizable irreparable harm to himself as opposed to potential harm to the agency and its partners."). "Harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of [] injunctive relief, which must instead be connected specifically to the parties before the Court." *New Mexico v. Musk*. Civ. A. No. 25-0429 (TSC) 2025 U.S. Dist. LEXIS 29871 at *12 (D.D.C. Feb. 18, 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021). Olson and Chi must demonstrate the likelihood of irreparable harm to themselves—not to the Foundation—if an injunction does not issue. *English,* 279 F. Supp. 3d at 335 (finding that terminated agency director failed to establish irreparable harm even if "there could be harm suffered by the [Agency] or by other parties if it is later determined that [plaintiff's replacement] has not been lawfully the acting Director[.]"). Because they have not done so, Olson and Chi are not entitled to a preliminary injunction.

RDI's purported irreparable harm is based on its claim that unless it receives notice by June 30, 2025, that its cooperative agreement with the Foundation has been reinstated, then RDI will not be able to continue operating. Pl. Mot. at 29-30. But these harms are entirely economic.

"Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (*quoting Wis. Gas Co.*, 758 F.2d at 674).  Rather, it is black-letter law that economic harm is generally not irreparable because compensation after the lawsuit generally ensures full relief.  *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled").  The only exceptions are "where the loss threatens the very existence of the movant's business," *id.*, or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981).  RDI may be forced to make difficult choices in critical areas of their operations without incurring irreparable harm sufficient to warrant injunctive relief.  *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction.").  And RDI must document any claim that an alleged harm is a threat to the business's very existence with specific details.  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).

RDI claims that "if RDI does not receive a notification that its cooperative agreement has been restored by June 30, 2025, it very likely will be unable to continue operating."  Makasa Decl. ¶ 10.  But RDI offers no meaningful explanation for why, if funding were restored after an outcome favorable to RDI in this action, it would not be able to reopen.  Accordingly, RDI has not offered

"proof" that it will cease to exist if the grant termination is not preliminary enjoined. *Wis. Gas Co.*, 758 F.2d at 674. Accordingly, RDI has not demonstrated that it will suffer irreparable harm absent a preliminary injunction.

## III.    **The Balance of Equities Favors Defendants.**

The final two factors required for preliminary injunctive relief—a balancing of the harm to the opposing party, and the public interest—merge when the Government is the opposing party. *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009); *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220-21 (D.D.C. 2015). Courts must "[give] particular regard [to] the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).

In this case, the balance of equities and the public interest tip strongly in favor of the Government, for "the public interest favors applying federal law correctly." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011). President Trump has entrusted Marocco with the leadership of the Foundation and issuing an order removing Marocco and voiding his actions as acting chairman of the Foundation Board would be an intrusion into the President's authority to exercise "all of" the "executive Power" of the United States. *Seila Law,* 591 U.S. at 203. Moreover, the public interest would be undermined if the President did not have a Foundation Board and leadership appointed by that Board who holds the President's confidence and, accordingly, will effectively serve him in executing his duties as Chief Executive. "[T]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 896 (1961)); *see also Wilcox*, 2025 U.S. LEXIS 1984, at *1-2 ("the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the

executive power than a wrongfully removed officer faces from being unable to perform her statutory duty.")

Additionally, in seeking an order removing Marocco from his position as acting chair of the Foundation Board and voiding the actions he has taken as acting chair of the Foundation Board, Plaintiffs seek a change in the status quo. Injunctions that "'would change the status quo' are disfavored as 'an even more extraordinary remedy' than the typical preliminary injunction, 'especially when directed at the United States Government.'" *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 93 (D.D.C. 2021) (quoting *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), and *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005)). Injunctions that alter the status quo, on balance, favor the non-movant. *See, e.g., Davis*, 76 F. Supp. 3d at 68; *Elite Entm't, Inc. v. Reshammiya*, Civ. A. No. 08-0641, 2008 WL 9356287, at *4 (D.D.C. Apr. 18, 2008). Because the preliminary injunctive relief that Plaintiffs seek will alter the status quo, the third and fourth factors weigh against granting the preliminary injunction.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: June 2, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By: _____*/s/ John J. Bardo*_____
        JOHN J. BARDO, D.C. Bar #1655534
        Assistant United States Attorney
        601 D Street, NW
        Washington, DC 20530
        (202) 870-6770

        *Attorneys for the United States of America*