# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Rural Development Innovations
Limited** *et al.*

       Plaintiffs,

**v.**

**Pete Marocco** *et al.*,

       Defendants.

**Civil Case No. 25-cv-1631**

### DECLARATION OF ELISABETH FELEKE

I, Elisabeth Feleke, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.    I am the Chief Program Officer at the United States African Development Foundation (USADF).

2.    I am one of three members of USADF's Management Committee—put in place by the former Board of Directors to lead USADF until a permanent replacement was hired.

3.    When the Court granted its preliminary injunction on July 1, I returned to my position on the Management Committee, running the day-to-day operations of USADF.

4.    After July 1, under the direction of the Management Committee, USADF was able to continue implementing and carrying out USADF activities, including its relationship with RDI.

1

5.    It took multiple months for USADF to implement the Court's preliminary-injunction order. Staff that Marocco had fired or put on administrative leave needed to be brought back. And USADF had a massive backlog of work that accumulated after Marocco first attempted to shut down the agency. That included (but was far from limited to) a backlog of payments due to grantees and USADF contractors, reinstatement of contracts, formal communication with all grantees and Country Program Coordinators overseas, and formal communication with foreign governments and U.S. embassies.

6.    When the Court granted Defendants' motion to narrow its preliminary injunction on November 19, it was unclear to me what decisions would be made by the Management Committee and what decisions would be made by someone else. Because we had not heard from or seen Marocco for 6 months, I did not expect that he would return and assert once again that he was fully in charge of USADF. I understood that, at a minimum, no Defendants could exert control over anything pertaining the implementation of RDI's grant, because RDI was still covered by the Court's order. So I understood that all the systems and staff who carried out RDI's grant before Marocco first asserted control of USADF needed to continue functioning as they previously had.

7.    On December 1, I received communication from Datawatch, one of USADF's vendors in charge of providing secured access to USADF office Building. On November 26, Peter Marocco contacted Datawatch directly and asserted to both the vendor and its legal counsel that he is the President and CEO of USADF. Acting on

his direction, the vendor terminated all USADF staff access to our offices. USADF staff did not receive formal notification of this action. We became aware of it only when staff attempted to enter the office at the start of the workday on December 1.

8.    To my knowledge, Datawatch's legal counsel did not receive formal communication from the Department of Justice. I reminded him that the Court had concluded that Marocco's appointment was likely unlawful and that USADF staff had not heard from or seen Marocco for six months. Datawatch's counsel stated that would not engage with USADF staff or leadership without approval from Marocco.

9.    By cutting off staff access to USADF offices, Marocco guaranteed that USADF staff no longer have access to USADF's on-site IT servers. Without server access, the agency cannot function securely, effectively, or withing statutory and regulatory requirements.

10.    On December 2, Marocco terminated USADF's access to all U.S. Department of the Treasury financial systems. As a result, USADF no longer has any authorized personnel with the ability to access or execute financial transactions.

11.    After a review of USADF's interface with Treasury systems, I learned that Marocco is listed as the sole authorized USADF user of our financial systems.

12.    Marocco's actions have rendered USADF unable to process payments, obligate, or disburse funds, or otherwise carry out its most basic financial operations for any grantee (or anyone else).

13.    Since December 2, all invoice payments submitted by USADF to Treasury have been automatically rejected. Without access to accounting systems or

payment platforms, USADF staff are unable to accept, review, and process payments in support of RDI. Despite USADF staff expressly stating their willingness to fully comply with the Court's order, Treasury officials have not responded to repeated inquiries asking why USADF invoices are being rejected, why USADF's financial staff are unable to access the system, and who authorized the termination of all USADF access and rejection of all invoice payments.

14.     After the Court's preliminary injunction order, until its modification of that order, USADF was able to, and did, pay RDI's expenses.

15.     Without access to USADF's financial systems, USADF are not able to continue paying RDI invoices that come due, including rent, maintenance of RDI offices, and RDI's internet.

16.     Between the Court's preliminary injunction order and its modification of the order, USADF was able to communicate with RDI.

17.     On December 12, USADF staff lost all remaining remote access to USADF IT systems. Remote access was already insufficient for activities involving federal funds, legal compliance, or court-ordered actions. But remote access at least allowed communication with RDI.

18.     Also on December 12, USADF's IT manager received a notice from the Department of Treasury that his contract was terminated.

19.     Because USADF staff has no access to emails, IT systems, or an IT manager, USADF has lost all official and direct communication with RDI.

4

20.     Due to overlapping procedures and federal regulations, it takes at least 8-10 employees to perform the core functions required by RDI's grant. For example, three employees in the program division review and approve invoices. Two employees, including the Chief Financial Officer, are required to submit invoices through the Treasury interface. An IT manager is necessary to ensure that USADF's security system complies with federal regulations. And at least one financial employee tracks treasury payments for the sake of fiscal audits and tracks USADF's local bank account in Zambia, where RDI is located, to monitor deposits and withdrawals. These requirements are the bare minimum and do not include what is necessary to make sure that USADF and its staff are abiding by other legal and regulatory requirements in the process.

21.     USADF's relationship with RDI (as with other partners) involves much more than the payment of money.

22.     USADF meets with partners, including RDI, on a weekly basis (sometimes more often). These meetings, and other regular communication—including by email—are essential for providing grantees critical guidance. That guidance includes, but is not limited to:

   a.  Guidance on maintaining contact and relationships with local and national governments, as well as other foreign organizations.

   b.  Guidance on managing field personnel and field offices, especially those responsible for providing technical assistance to other USADF grant recipients.

c.  Guidance on gathering information and preparing solutions for technical challenges encountered during the implementation of USADF grants.

d.  Providing training on an as-needed basis to address operational challenges that arise for grantees.

e.  Providing counsel and facilitating necessary connections with other partners and government resources.

f.  Guidance on conducting the project monitoring and data collection that USADF requires of grantees.

g.  Guidance on how grantees safeguard and protect USADF's assets in foreign countries.

23.    Without the ability to contact the expert USADF staff knowledgeable in these areas, RDI has no way of getting the guidance, oversight, and advice that is necessary for it to continue carrying out its grant.

24.    On December 12, USADF's Chief Financial Officer informed me that the most recent financial report from Treasury showed that USADF's congressionally appropriated funds have been removed, contrary to the FY26 Continuing Resolution. The relevant line item in the financial report indicates that USADF currently has no available funds.

25.    In all, USADF is once again effectively shut down and lacks any operational capacity.

26.     As a result of Marocco's and Defendants' actions, USADF is unable to comply in any way with the court ordered preliminary-injunctive relief for RDI.

27.     Given Marocco's recent actions, I am also concerned that he is once again attempting to effectively shut down the entire agency. If he is able to terminate staff, cancel contracts, and destroy USADF's infrastructure while the Court is deciding the case, that will mean that once again USADF will have to spend months undoing all of those actions. Among other things, that backlog of work will mean that USADF will not be in a position to perform its obligations to RDI under the terms of the grant agreement.

Washington, DC                                              /s/ Elisabeth Feleke
December 17, 2025                                          Elisabeth Feleke